PETER J. LIO AND CATHERINE A. LIO, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DAVID H. ORTH AND BARBARA A. ORTH, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29514–81, 13143–82.    Filed July 24, 1985.

*Paul C. Arshonsky, Michael A. Sandberg,* and *Steven S. Brown,* for the petitioners.

*Judy Jacobs,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes:

| Petitioners | Taxable year | Deficiency | Addition to tax sec. 6653(a), I.R.C. 1954[1] |
|---|---|---|---|
| Peter J. and Catherine A. Lio | 1977 | $19,732 | $987 |
| David H. and Barbara A. Orth | 1979 | 16,389 | - - - |

After concessions, the issues presented for our consideration are: (1) Whether the determination of the fair market value of lithographs which the petitioners purchased in large quantities and donated to charities is to be based on the marketplace in which the petitioners purchased such lithographs, and (2) whether the petitioners were dealers in lithographs so that their charitable contribution deduction is limited to cost by section 170(e)(1)(A).

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners Peter J. and Catherine A. Lio are husband and wife, who resided in Highland Park, Ill., at the time of the filing of the petition herein. They filed their joint Federal income tax return for 1977 with the Internal Revenue Service Center, Kansas City, Missouri. Petitioners David H. Orth and Barbara A. Orth are husband and wife, who resided in Olympia Fields, Illinois, at the time of filing their petition

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

herein. They filed their joint Federal income tax return for 1979 with the Internal Revenue Service.

A lithograph is a piece of paper which contains an artistically reproduced image. The image is produced by pressing the paper onto a hard object known as a plate, which has part of its surface covered with ink. Typically, a plate is used to create multiple impressions of the same image. Editions are usually limited in number. After the edition has been completed, the plate is then destroyed or canceled.

Lithographs are usually sold to the public by art galleries and art dealers. Galleries and dealers sell both framed and unframed lithographs to the public. While more lithographs are sold framed, it is not uncommon for the public to purchase unframed lithographs from galleries and dealers. The parties have agreed that such general statements are applicable to the Leonardo Nierman lithographs at issue in this case but did not agree that such general statements are applicable to the William Nelson lithographs at issue in this case.

A frame provides a visual border for a lithograph but does not otherwise physically affect it. The process of framing or removing a lithograph from a frame does not physically affect the lithograph. Lithographs, if displayed, are typically framed. A framed lithograph is sold for an average of $75 more than the lithograph unframed, but this increment may vary depending upon the quality and size of the frame.

On January 28, 1977, Dr. Lio entered into a contract to purchase 150 unframed lithographs by the artist William Nelson from Art Appraisers of America, Ltd. (AAA), for $7,500 ($50 each).[2] Dr. Lio made the required payment for the lithographs, and they were delivered to him.

AAA was the sole publisher and distributor of William Nelson lithographs during 1976, 1977, and 1978. The "Standard Purchase Agreement" (the agreement) entered into between Dr. Lio and AAA states that Mr. Nelson is in the process of creating 30 or more original lithographs, each in a limited and numbered edition of not more than 500, plus 20 artist's proofs, which AAA will divide into approximately 75 investment portfolios containing 200 assorted lithographs

---

[2] The agreement actually states that Dr. Lio (the "collector") agrees to purchase one investment portfolio containing 200 assorted lithographs for $10,000, but it is clear from the stipulations and other exhibits that only 150 lithographs were sold to him for a total purchase price of $7,500.

each. The particular lithographs purchased by Dr. Lio were not specified in the agreement.

The agreement also provides that at the time of delivery, AAA will supply Dr. Lio with two "independent appraisals" stating that the fair market value of each lithograph contained therein is not less than $150. The agreement further states that within 1 year after the investment portfolios are delivered to Dr. Lio, AAA shall, upon request, supply at no additional charge a list of charitable organizations which will accept a donation of the lithographs and two independent appraisals setting forth their then current fair market value.

On November 29, 1977, Dr. and Mrs. Lio, having owned the lithographs for more than 9 months,[3] donated the following 150 William Nelson unframed lithographs to the Rockford Art Association/Burpee Art Museum (Rockford Museum)[4] in Rockford, Illinois:

| Title | Quantity purchased | Numbers of lithographs donated | Number in edition |
|-------|--------------------|-------------------------------|-------------------|
| The Mailbox | 25 | 106,107, 163–185 | [5]300 plus 20 AP |
| Baton Pass | 25 | 1 – 25 | 500 plus 20 AP |
| Ready to Haul | 25 | 91 – 115 | 500 plus 20 AP |
| Prairie View Feed Co. | 25 | 31 – 55 | 350 plus 20 AP |
| Flying Jibs | 25 | 92 – 116 | 350 plus 20 AP |
| Kedzie L | 25 | 248 – 272 | 350 plus 20 AP |

In 1977, two other individuals each donated 200 William Nelson lithographs to the Rockford Museum. The museum has not accessioned the Nelson lithographs to its permanent collection or displayed them, nor does it have a present intention to do so. The museum did not insure the lithographs. Dr. Lio insured the lithographs for a total of $1,000 when he mailed them to the museum.

---

[3]The required holding period for long-term capital gain treatment was 9 months for taxable years beginning in 1977. See secs. 1222(3) and 170(e)(1)(A).

[4]The Rockford Museum is an organization described in sec. 170(c).

[5]Artist's proofs.

Membership in the Rockford Museum costs $15 for an individual and $25 for a family. In 1981, five of the Nelson lithographs were given away by the Rockford Museum as part of a promotional incentive to individuals and families to become new members. The remaining 545 Nelson lithographs donated in 1977 are in storage on the museum's premises.

During 1977, AAA sold 12,225 Nelson lithographs, 97 percent of which were sold for $50 or less. Ninety-eight percent of the 12,225 lithographs were sold to individuals predominantly in quantities of from 50 to 400 lithographs. None of the lithographs from the five Nelson editions purchased by Dr. Lio was sold for more than $50. Ninety-six percent of all sales of Nelson lithographs during 1977 were for $50.

From 1975 through 1980, Nelson lithographs were also marketed by mail order. Jean Paul Loup, a mail order dealer, sold 580 Nelson lithographs comparable in size, method of reproduction, quality of printing, thematic character, and quantity of edition to those donated by Dr. Lio. Approximately 75 percent of the 580 lithographs were sold for $150 each.[6] Of this number, 114 lithographs were sold in multiples of from 2 – 11 to 38 purchasers. The relatively few lithographs which sold for more than $150 (generally from $200 to $300 each) were from different editions than those that sold for $150 or less. The remainder of the lithographs were sold to dealers individually, usually at a 50-percent discount from the price charged nondealers.

In December 1979, Merrill Chase Galleries (Merrill Chase), a chain of art galleries in the Chicago area, acquired 52 unframed Nelson lithographs comparable in size, method of reproduction, quality of printing, thematic character, and quantity of edition to those donated by the petitioner. By February 28, 1980, the chain had sold 37 of the lithographs, framed, for $260 to $325 each. Merrill Chase subsequently acquired additional Nelson lithographs and sold a total of 68 from December 1979 to the date of trial. There were no sales of Nelson lithographs by Merrill Chase prior to December 1979.

Dr. Lio is a dentist, and Mrs. Lio devotes her time to raising the couple's three children. They did not at any time advertise, promote, or display lithographs for sale to third parties. No

---

[6] Jean Paul Loup also sold watercolor paintings by William Nelson. Five such sales were consummated with prices ranging from $500 to $2,700.

books of account relative to lithographs were maintained by the Lios, nor did they maintain a separate office or store for the purchase, maintenance, or subsequent contribution of lithographs. They did not have any business stationery, nor did they maintain a separate mailing address or telephone number for their purchase or donation of lithographs.

On their 1977 Federal income tax return, Dr. and Mrs. Lio claimed a charitable contribution deduction of $24,688 for the donation of the 150 Nelson lithographs to the Rockford Museum. On November 14, 1977, Bruce Duncan, president of the Chicago Appraisers Association, valued the 150 lithographs at $26,875, and on November 15, 1977, Bruce B. Kodner, an appraiser for Howard Art Galleries, Inc., Chicago, Ill., appraised the 150 lithographs at $150 each for a total value of $22,500. The contribution deduction claimed by the Lios is an average of the appraisals received from Mr. Duncan and Mr. Kodner. These appraisals were prepared in accordance with the provisions of Dr. Lio's contract with AAA.

In the notice of deficiency, the Commissioner disallowed the deduction to the extent it exceeded $7,500, Dr. and Mrs. Lio's cost basis in the lithographs. The Commissioner conceded that there is no addition to tax for negligence due from the Lios and that they are entitled to an ordinary loss in 1977 of $5,300 from Randolph Research Associates.

On September 15, 1978, Dr. and Mrs. Orth purchased the following 100 unframed Nierman lithographs from Greenwich Art Consultants, Inc. (Greenwich), for $10,000:

(a) One single suite entitled "Intuition de L'Univers" Suite #123
(b) Three double suites entitled "Intuition de L'Univers" Suites #XV/LXXV, XVIII/LXXV, and XLV/LXXV
(c) One suite entitled "Sound of Color" Suite #XVI/LXXX
(d) Four Mahler lithographs #151, 152, 153, and 154/250
(e) One Brahms lithograph #176/250
(f) Four Debussy lithographs #149, 150, 151, and 152/250
(g) Four Bach lithographs #150, 151, 152, and 153/250
(h) Four Mozart lithographs #156, 157, 158, and 159/250
(i) Two Ravel lithographs #138 and 139/250
(j) Four Stravinsky lithographs #197, 198, 199, and 200/250

On March 30, 1979, Dr. Orth insured the lithographs with Safeco Insurance Co. of America, ascribing a value of $300 to each lithograph.

A "suite" is a term used in the retail art industry for a set of works by the same artist (or sometimes by different artists) often on the same theme or subject matter that are compiled and offered together as a set. A single suite of "Intuition de L'Univers" consists of 10 lithographs, and a double suite of "Intuition de L'Univers" contains 20 lithographs. There are 271 "Intuition de L'Univers" suites in existence, consisting of 101 double suites and 170 single suites. Thus, there are 3,720 individual lithographs from such suite in existence.

Each "Sound of Color" suite contains seven lithographs. There are 350 "Sound of Color" suites in existence. Thus, there are 2,450 individual lithographs from such suite in existence.

In December 1979, Dr. Orth, having owned the Nierman lithographs for more than 12 months[7] after purchase, donated 73 lithographs, unframed, to the following organizations, all of which qualify under section 170(c):

| Organization | Lithographs | |
|---|---|---|
| Mundelein High School | One suite"Sound of Color" suite #XVI/LXXX (7 lithographs) | |
| | | |
| Waukegan Public Schools | 1. Mozart | 157/250 |
| | 2. Debussy | 151/250 |
| | 3. Mahler | 154/250 |
| | 4. Bach | 150/250 |
| | 5. Stravinsky | 197/250 |
| | | |
| Thornton Fractional High School | One double suite "Intuition de L'Univers" suite #XVIII/LXXV (20 lithographs) | |
| | | |
| Chicago Public Library | 1. Mozart | 158/250 |
| | 2. Debussy | 150/250 |
| | 3. Mahler | 153/250 |
| | 4. Bach | 152/250 |
| | 5. Stravinsky | 198/250 |
| | | |
| Chicago Board of Education | 1. Mozart | 156/250 |
| | 2. Debussy | 149/250 |
| | 3. Bach | 151/250 |
| | 4. Mahler | 151/250 |
| | 5. Ravel | 138/250 |
| | 6. Stravinsky | 199/250 |

[7]For the taxable year 1979, the holding period required for long-term capital gain treatment was 12 months. See secs. 1222(3) and 170(e)(1)(A).

| *Organization* | *Lithographs* |
|---|---|
| The Woodlawn Organization | One single suite "Intuition de L'Univers" suite #123/150 (10 lithographs) |
| Deerfield Public Schools | One double suite "Intuition de L'Univers" suite #XV/LXXV (20 lithographs) |

Lublin Graphics, Inc. (Lublin), was the sole U.S. distributor of Nierman lithographs. Lublin also published and distributed works by other artists. Prior to 1983, virtually all of the lithographs sold by Lublin were unframed sales to art dealers and art galleries for resale to the public. In 1975, Lublin began selling lithographs from the "Intuition de L'Univers" edition. None of the 3,720 lithographs originally printed remained in inventory at Lublin at the time of trial. In 1976, Lublin began selling lithographs from the "Sound of Color" edition. As of the date of trial, approximately 200 of the 2,450 lithographs originally printed remained in inventory at Lublin.

Art Consultants Ltd. (Art Consultants) was a subchapter S corporation incorporated in 1977. It was also called Sinclair Galleries, Ltd. Its business consisted of selling graphics, which are multiple artistic reproductions and include the subcategory of lithographs. Virtually all of the graphics sold by Art Consultants were unframed, and virtually all of the sales were to individuals.

Art Consultants did not have a public area for the display of art. Most of the art sold by it was "drop shipped," which means that it was shipped directly from the publisher or distributor to the individual who purchased it from Art Consultants. Art Consultants used an office which was rented by the law firm of Kamensky & Landan (now Kamensky & Rubinstein) and which was within the suite occupied by the law firm. This office was used to store art and to maintain the books and records of Art Consultants.

Greenwich was a joint venture between Art Consultants and Preferred Partnerships, Inc. Greenwich was formed for the limited purpose of selling lithographs from the "Sound of Color" and the "Intuition de L'Univers" editions. It used the facilities and personnel of Art Consultants. Greenwich sold the Nierman lithographs unframed to individuals for $100 each. It did not sell any art to galleries.

During 1978 and 1979, Lublin sold a total of 2,319 Nierman lithographs. During 1978 and 1979, Greenwich purchased approximately 63 percent (1,473) of the Nierman lithographs sold by Lublin for $50 each. All of the Nierman lithographs purchased by Greenwich during 1978 and 1979 were from either the "Sound of Color" or the "Intuition de L'Univers" suites, and such purchases constituted approximately 24 percent of the total lithographs in existence from each suite.

Greenwich sold almost all of its Nierman lithographs that it purchased from Lublin. The sales were all for $100 per lithograph and took place in 1978 and January of 1979. Virtually all of the lithographs were sold in large quantities to individuals.

In 1979, galleries sold an unspecified number of single lithographs from the "Sound of Color" and the "Intuition de L'Univers" editions for approximately $300, unframed. Lithographs from the "Sound of Color" edition are still available for sale in some galleries.

There are no markets, and in 1979 there were no markets, for Nierman lithographs other than the markets herein described.

Dr. Orth framed 9 of the 100 Nierman lithographs purchased from Greenwich in 1978. Those 9 lithographs have been on display since 1980 in Dr. Orth's office. The remaining 18 lithographs are in storage.

On February 25, 1980, Art Consultants sent Dr. Orth the following items to be used in preparing his 1979 Federal income tax return: (1) Letters from the organizations to which he contributed the lithographs acknowledging their receipt; (2) two appraisals of the 73 lithographs—one by R. Bruce Duncan, president of the Chicago Appraisers Association, who appraised them at $24,000, and one by Ross Edman, an appraiser of arts and antiques in Chicago, Ill., who appraised them at $24,464; and (3) photographs of the lithographs.

Dr. Orth is a physician. Dr. and Mrs. Orth did not at any time advertise, promote, or display lithographs for sale to third parties. They did not sell any lithographs. No books of account relative to lithographs were maintained by the Orths, nor did they maintain a separate office or store for the purchase, maintenance, and subsequent contribution of lithographs. The Orths did not have any business stationery, nor

did they maintain a separate mailing address or telephone number, for their purchase or donation of lithographs. Dr. Orth devoted substantially all of his working time to his occupation as a physician.

On their Federal income tax return for calendar year 1979, Dr. and Mrs. Orth claimed a charitable contribution deduction of $27,682 (or approximately $379 each) for the donation of 73 Nierman lithographs to qualified charitable organizations. It is not apparent from the record how the Orths arrived at that figure, but on brief, they argue that the lithographs had a total fair market value of $21,900 (or $300 each) as of the date of donation.

In the notice of deficiency, the Commissioner disallowed the Orths' claimed deduction to the extent it exceeded $7,300, the cost of the lithographs. For purposes of this trial, we have severed the issue concerning the amount of the allowable deductions for the contribution of the lithographs, and our opinion will deal only with that issue.

## OPINION

The primary issue for our decision in this case is whether the fair market value of lithographs donated to charitable organizations exceeds the amounts paid by the petitioners for such lithographs. If we find that there is such an excess, we must then decide whether the petitioners' charitable contribution deductions are nevertheless limited to cost by section 170(e)(1)(A).[8]

Section 170(a)(1) allows a deduction for any charitable contribution to or for the use of an organization described in section 170(c), payment of which is made during the taxable year. In general, the amount of a charitable contribution made in property other than money is the fair market value of the property at the time of the contribution. Sec. 1.170A–1(c)(1), Income Tax Regs. Section 1.170A–1(c)(2) of the regulations defines fair market value as "the price at which the property would change hands between a willing buyer and a willing

---

[8]Because the Lios and the Orths received letters from the charities to which they donated the lithographs stating that they would be used in a manner relating to the purpose or function constituting the basis for the charities' exemption under sec. 501, the Commissioner concedes that sec. 170(e)(1)(B) does not limit the amount of the petitioners' contribution deduction. See sec. 1.170A–4(b)(3)(ii)(*b*), Income Tax Regs.

seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." See *United States v. Cartwright*, 411 U.S. 546 (1973); *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979). Fair market value is a question of fact to be determined from an examination of the entire record. *Skripak v. Commissioner*, 84 T.C. 285, 320 (1985); *Zmuda v. Commissioner*, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); *Jarre v. Commissioner*, 64 T.C. 183, 188 (1975). The petitioners bear the burden of proving that the Commissioner's determination of the fair market value of the property involved herein is in error. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

Although section 170 and the regulations promulgated thereunder are silent as to the market to be used in determining the value of donated property, it has been recognized that the valuation test for estate and gift tax purposes is generally the same as that used for charitable contribution deduction purposes. *United States v. Parker*, 376 F.2d 402, 408 (5th Cir. 1967); *Anselmo v. Commissioner*, 80 T.C. 872, 881–884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Section 20.2031–1(b), Estate Tax Regs., and section 25.2512–1, Gift Tax Regs., provide that the fair market value of an item of property is to be determined in the market where such item is "most commonly sold to the public." Sec. 20.2031–1(b), Estate Tax Regs., provides in relevant part as follows:

Thus, in the case of an item of property * * * which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) * * * is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile * * * would be purchased by a dealer in used automobiles. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * *

In the *normal* situation, a sale "to the public" refers to a sale to the "retail customer who is the ultimate consumer of the property." *Anselmo v. Commissioner*, 80 T.C. at 882; see also *Skripak v. Commissioner*, *supra* at 322. The determination of

the proper market for valuation purposes is also a question of fact. *Anselmo v. Commissioner*, 757 F.2d at 1213.

In *Anselmo v. Commissioner, supra,* we were required to value a donation of 461 colored gemstones. We rejected the petitioners' contention that the valuation of the stones should be based on sales of jewelry containing such stones to ultimate consumers and that the value of the stones equaled the portion of such price attributable to the stone. We found that such stones were not commonly sold to individual purchasers but rather that they were sold to retail jewelers for use in the manufacture of jewelry. We said:

> The last stage in the chain of distribution at which unset gems like petitioner's are sold is the sale by wholesalers, jobbers, or memorandum houses to jewelry stores of individual stones or small parcels of stones. This is the nearest we have to a sale to the public. We have therefore found as a fact that jewelers, not individual purchasers, at retail, are the ultimate consumers of these stones. Thus, the sale of individual stones to the store is not, in our case, a sale for resale; it is a sale for consumption of the stone. It is this transaction which must be treated as a sale to the public. [80 T.C. at 882.]

In *Skripak v. Commissioner, supra,* we were asked to value scholarly reprint books. We found that, with respect to such books, the market in which they are ordinarily sold to the ultimate consumer is the "retail market place, comprised largely of institutional buyers (libraries) and, to a minor extent, of individuals seeking a specific scholarly text." 84 T.C. at 322. However, we rejected the evidence offered by the petitioners concerning the prices at which such books were sold at retail; in explanation, we said:

> the major flaw in petitioners' valuation approach * * * is petitioners' failure to consider the sheer numbers of books that are to be valued for each petitioner. As against this, the information relied upon by petitioners is simply insufficient to represent the large universe of reprint titles the Court is called upon to value. [84 T.C. at 324.]
> * * * The simultaneous marketing of all those books would substantially depress the market for each particular reprint title and for the multiple copies of each title. * * * [84 T.C. at 325.]

In *Chiu v. Commissioner*, 84 T.C. 722 (1985), we were again required to value a gift of colored gemstones. Both the petitioners and the Commissioner presented expert opinions to support their views of the value of the stones. However, we

found such expert testimony not to be convincing, and we concluded that the prices actually paid for the stones represented the most reliable evidence of their value. There was no evidence that the petitioners had purchased the stones "at prices not reflecting the appropriate market" or that the stones had appreciated in value between the times of the purchases and their gifts. *Chiu v. Commissioner, supra* at 736.

Under these cases,[9] we must first identify the market where the lithographs at issue in this case are commonly purchased by the ultimate consumers and ascertain the price paid for them in such market. *Anselmo v. Commissioner*, 80 T.C. at 882. The petitioners argue that lithographs are most commonly sold to the public by art galleries and dealers at retail prices and that, therefore, the prices charged by such galleries and dealers for individual Nelson and Nierman lithographs are determinative of fair market value. They maintain that since art galleries sold an unspecified number of unframed Nierman lithographs from the same editions as those at issue for $300 each in 1979, and since some similar Nelson lithographs were sold by a mail order dealer unframed at $150 each from 1975 through 1980 and by a gallery framed for $260 to $325 each between December 1979 and February 28, 1980, they are entitled to charitable contribution deductions of $300 for each of the donated Nierman lithographs and of $150 for each of the donated Nelson lithographs. We do not agree with the petitioners' definition of the appropriate market.

The petitioners did not testify as to their motives for purchasing the lithographs, but it is abundantly clear from the stipulations and exhibits in the record that they purchased the lithographs for their own use or for subsequent donation. Dr. Lio is a dentist, and Mrs. Lio devotes her time to raising their children. The Lios are not in the business of buying and selling lithographs. Similarly, Dr. Orth is a physician, and the Orths are not in the business of buying and selling lithographs. Furthermore, as a part of the arrangements for the purchase of the Nelson lithographs, AAA provided Dr. Lio with a list of museums that would accept such lithographs, and both AAA and Greenwich furnished appraisals to the Lios and Orths that

---

[9]See also *Lightman v. Commissioner*, T. C. Memo. 1985–315; *Lampe v. Commissioner*, T. C. Memo. 1985–236; *Price v. Commissioner*, T. C. Memo. 1985–182; *Theodotou v. Commissioner*, T. C. Memo. 1985–181; *Talebi v. Commissioner*, T. C. Memo. 1985–180.

could be used for tax purposes. In fact, Dr. and Mrs. Lio made a gift of the entire 150 lithographs purchased by them. Dr. and Mrs. Orth made a gift of 73 of the lithographs purchased by them, displayed 9 of them in Dr. Orth's office, and retained in storage the remaining 18. Under these circumstances, it is clear that the Lios and Orths did not purchase the lithographs for resale; they were ultimate consumers of the lithographs.

Lithographs may be purchased by individuals from galleries or from those dealers that sell each lithograph separately, but such are not the only sources for purchasing lithographs. Indeed, the facts of this case demonstrate that most of the lithographs of the types at issue were not purchased from such sources. During 1976, 1977, and 1978, AAA was the sole distributor of the Nelson lithographs, and in 1977 (the Lios' taxable year in issue), it sold 12,225 of them. Ninety-eight percent of such sales were made to individuals in lots of 50 to 400 each. Likewise, in 1978 and 1979, Lublin, which was the sole American distributor of the Nierman lithographs, sold 63 percent (1,473) of such lithographs in those years to Greenwich, and Greenwich sold all of such lithographs in large quantities to individuals. Thus, the sales of these lithographs by galleries and small dealers constituted a miniscule part of the market; most of the sales were made by AAA and Greenwich. Moreover, most of the sales by the galleries and small dealers were of one or only a few lithographs at a time; whereas, Dr. Lio purchased 150, and Dr. Orth purchased 100, of the lithographs. Although the petitioners made bulk purchases of the lithographs in issue, there is no evidence that individual lithographs could not have been purchased for the same price from AAA and Greenwich. Hence, the sales by AAA and Greenwich must be taken into consideration when we seek to find the prices most commonly paid by the individuals who purchase these lithographs for their own use or for gifts to museums.

Clearly, on the facts before us, AAA and Greenwich acted as art dealers, and the petitioners purchased the lithographs as individual customers. The sales of the lithographs to the petitioners were as much sales to "ultimate consumers" as the sales by art galleries and dealers to other individuals upon which the petitioners rely. It is common knowledge that a consumer can pay a wide range of *retail* prices for the same

item depending on where he chooses to shop and how much investigating he does of the various sources of a particular item. See W. Speiller, "The Favored Tax Treatment of Purchasers of Art," 80 Colum. L. Rev. 214, 228–229 (1980). We do not construe the term *retail* as used in this context to mean that where a consumer has a choice of several sources for an item, only the most expensive source is a retail sale and all other sources are wholesale. Rather, the sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale (see *Goldman v. Commissioner*, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966)), and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved. In the present case, the most active marketplace for Nelson and Nierman lithographs was the marketplace in which the petitioners purchased them.

A few individuals paid as much as $300 for each of the Nierman lithographs and $150 each for similar Nelson lithographs, but such prices clearly do not reflect the prices commonly paid for such lithographs. See *Skripak v. Commissioner*, 84 T.C. at 323–324. In the case of the Nierman lithographs, the only evidence of sales of such lithographs, other than those by Greenwich, is the stipulation that, in 1979, art galleries sold single lithographs of the type at issue for $300. There was no evidence of the number of such sales, the types of customers, or other relevant information; whereas, we know that, in 1978 and 1979, Greenwich sold approximately 63 percent (1,473) of such lithographs at a price of $100 each. Such evidence of value is far more persuasive than the vague stipulation. See *Chiu v. Commissioner, supra.*

In the case of the Nelson lithographs, the petitioners rely on the sales by Jean Paul Loup and by Merrill Chase. The mail order sales by Jean Paul Loup were made over the years 1975 to 1980 and consisted of 580 lithographs, of which approximately 75 percent were sold for a price of $150 each. The sales by Merrill Chase consisted of only 37 sales made in late 1979 and early 1980 at a price of from $260 to $325 for each lithograph, framed. On the other hand, in 1977, AAA sold 12,225 Nelson lithographs, and 97 percent of such sales were made at a price of $50 or less for each lithograph. Again, the sales by AAA constitute far more persuasive evidence of the

value of the lithographs than the relatively few sales made by Jean Paul Loup or Merrill Chase. *Chiu v. Commissioner, supra.* Furthermore, the Rockford Museum has not insured, accessioned to its permanent collection, or displayed the Nelson lithographs. The use to which donated property is put is relevant in determining fair market value. *Chiu v. Commissioner,* 84 T.C. at 736; *Skripak v. Commissioner,* 84 T.C. at 322.

The evidence of fair market value in this case resembles the situation in *Chiu v. Commissioner, supra.* In that case, the parties sought to rely on expert opinions of fair market value, but the Court found such testimony to be unpersuasive. The Court concluded that the prices actually paid presented far more convincing evidence of value. *Chiu v. Commissioner,* 84 T.C. at 734. In *Skripak v. Commissioner, supra,* the petitioners relied on an expert opinion that was based on only a relatively few sales, and the Court rejected such evidence because it failed to take into consideration the bulk of the sales. 84 T.C. at 324. Similarly, in this case, the petitioners seek to establish fair market value by relying on the prices paid in only a few sales. We find much more persuasive the actual prices paid by the petitioners only a short period of time prior to the valuation dates and the evidence of the prices paid by others who purchased from the same sources as the petitioners. Furthermore, there is no evidence that the petitioners received any special discount not generally available to others who purchased under similar circumstances or that there was any significant appreciation in the value of the lithographs between the times of the purchases and the gifts. See *Tripp v. Commissioner,* 337 F.2d 432, 434–435 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. Accordingly, we hold that the fair market value of the Nierman lithographs at the time of their donation was $100 each and that the fair market value of the Nelson lithographs at the time of their donation was $50 each. In view of this conclusion, we do not reach the Commissioner's alternative argument.

*Decision will be entered under Rule 155 in docket No. 29514–81.*

*An appropriate order will be issued in docket No. 13143–82.*