KENNETH SANDLER and TACY F. SANDLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sandler v. Commissioner
Docket No. 12367-83.
United States Tax Court
T.C. Memo 1986-451; 1986 Tax Ct. Memo LEXIS 160; 52 T.C.M. (CCH) 563; T.C.M. (RIA) 86451; September 17, 1986. Leonard Sarner, for the petitioners. James P. Clancy, for the respondent. JACOBS
*161 MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent originally determined a deficiency in petitioners' 1979 Federal income tax in the amount of $5,894. In his amended answer to the petition, respondent claimed a $1,500 increased deficiency, thus making the total amount in controversy $7,394. The issues for decision are: (1) whether petitioners, in November, 1979, made a completed gift of 30 graves in the Whitemarsh Memorial Park to St. Paul's Evangelical Lutheran Church; and (2) if so, the amount of the deduction to which petitioners are entitled with respect to such gift. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Kenneth and Tacy Sandler, husband and wife, resided in Malvern, Pennsylvania, at the time they filed their petition. Tacy is a party solely because she filed a joint return with her husband for 1979; therefore, Kenneth will be referred to as petitioner. Petitioner is a practicing physician, specializing in psychiatry. In the spring of 1978, he learned through his accountant, Irv C. Jaffe, C.P.A., that the Estate of Nora *162 H. Landis had available for sale 30 grave sites in Whitemarsh Memorial Park (the Cemetery). Petitioner authorized Jaffe to purchase the grave sites on his behalf, and he gave him a check in the amount of $1,950, the estimated purchase price. [1]
The purchase price of the 30 grave sites from the Landis estate was $3,000. On October 9, 1978, petitioner gave Jaffe a check for $1,600, representing the balance due plus $550 for Jaffe's services. On October 21, 1978, the executor of the Landis estate formally assigned the lots to petitioner, and on November 6, 1978, a new deed was issued by the Cemetery to petitioner, which Jaffe kept for safekeeping. In the fall of 1979, Jaffe spoke with the Reverend Edward Treichel, Pastor of St. Paul's Evangelical Lutheran Church (the Church), inquiring whether the Church would accept a gift of the grave sites; the pastor indicated that such a gift would be accepted. On November 7, 1979, Jaffe gave the pastor the deed which had been issued to petitioner the year before, and the pastor gave Jaffe a *163 letter thanking petitioner for the gift. [2]
The gift of the grave sites to the Church was unconditional -- the Church could use the graves as it deemed fit, although Jaffe suggested that the graves be used for "indigent people or people that might have lesser means." The pastor placed the deed on his desk; he later placed and kept it in a file, satisfied that possession of the deed constituted ownership of the grave sites. Shortly thereafter, he informed a local funeral director that the Church had the grave sites available for use by persons unable to afford a site. In the summer, 1983, the funeral director suggested that a deed in the name of the Church be obtained from the Cemetery. The pastor followed this suggestion, and he obtained cards of transfer, which petitioner signed on September 3, 1983. A deed was issued by the Cemetery to the Church on February 16, 1984. Neither petitioner nor Jaffe told the pastor to delay obtaining this deed; the delay in perfecting record title was due solely to the pastor's inadvertence. In 1980, petitioner purchased, again at Jaffe's *164 suggestion, an additional 30 grave sites in Whitemarsh Memorial Park for $5,000. In 1981, Jaffe donated these grave sites, on petitioner's behalf to another church. All deeds issued by the Cemetery provided: "No transfer, conveyance or assignment of any interest or rights acquired by Grantee shall be valid without the written consent of Grantor [Whitemarsh Memorial Park Cemetaries Company] and being thereafter recorded on its books." In his 1979 return, petitioner claimed a charitable contribution deduction of $15,000 attributable to the 30 grave sites donated to the Church.In his notice of deficiency, respondent disallowed $12,000 of the claimed $15,000 deduction. Subsequently, in his amended answer, respondent disallowed the entire $15,000 deduction, contending that no completed gift occurred in 1979. Alternatively, respondent contends that had petitioner sold the grave sites (rather than donate them to the Church), any gain realized from such theoretical sale would have been taxed as ordinary income (rather than capital gain); thus, pursuant to section 170(e) [3], the amount of the charitable contribution deduction allowable to petitioner with respect to the donation of *165 the grave sites is limited to his cost basis. ULTIMATE FINDINGS OF FACT (1) Petitioner made a completed gift of 30 grave sites to the Church on November 7, 1979. (2) The fair market value of the donated 30 grave sites on November 7, 1979 was $4,000. (3) The grave sites were capital assets in petitioner's hands. OPINION Section 170(a) allows as a deduction a contribution or gift to any entity described in section 170(c) [4], payment of which is made within the taxable year. Section 1.170A-1(c)(1), Income Tax Regs., provides that if property other than money is contributed to charity, the amount of the contribution is the fair market value of the property at the time of contribution, reduced as provided by section 170(e)(1). Section 1.170A-1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. *166 " See United States v. Cartwright,411 U.S. 546 (1973). Respondent's primary argument is that petitioner did not make a completed charitable gift of the grave sites to the Church in 1979. [5] We disagree. Section 1.170A-1(b), Income Tax Regs., provides that a contribution is ordinarily made at the time delivery is effected. In general, with respect to the contribution of a check to charity, delivery occurs when the check is mailed or delivered to the charity, not when the check clears the bank; with respect to the contribution of stock to charity, the gift is completed on the date of delivery to the donee or on the date of mailing, not on the date the stock is transferred on the books of the corporation. Here, both petitioner and the Church believed that the gift of the 30 grave sites occurred on November 9, 1979 and that as of that date, the Church unconditionally owned the grave sites. The issuance of a deed *167 to the Church was, under the instant circumstances, a formality; the delay in obtaining the deed was due solely to the pastor's inadvertence. Petitioner knew nothing of the delay, believing that everything necessary to cause the Church to own the grave sites had occurred. The subsequent issuance of a deed to the Church ratified and confirmed the earlier act of the parties. In our opinion, the provision in the deed restricting transfer of the lots without the consent of the Cemetery was for the sole protection of, and enforceable only by, the Cemetery; it did not vitiate that which already had occurred, i.e., the gift of the grave sites from petitioner to the Church in 1979. For tax purpose, a charitable contribution is synonymous with a gift. DeJong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). Under Pennsylvania law, in order to establish a valid inter vivos gift, there must be (1) an intent to make an immediate gift, and (2) an actual or constructive delivery to the donee, as well as divestiture by the donor of dominion and control of the property. Actual delivery is necessary in order to avoid possible adverse *168 effects on third parties as well as to protect the donor from fraud. Where the donor admits the making of a gift and where no third party is involved, actual delivery is not required. See Hengst v. Hengst,491 Pa. 120, 420 A.2d 370 (1980). Here, petitioner admits the making of a gift which involved no third party. We therefore hold that petitioner is entitled to a charitable contribution deduction in 1979 for the donation of the 30 grave sites to the Church. We must now determine the amount of the deduction. In determining the amount of the charitable contribution deduction to which petitioner is entitled, we must first determine whether petitioner would have realized ordinary income had he sold the grave sites at a price in excess of his cost. Section 170(e)(1)(A) provides that the amount of any allowable charitable contribution shall be reduced by the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value. Section 1.170A-4(b)(1), Income Tax Regs., provides that "ordinary income property" includes property held by the donor primarily for sale to customers in the ordinary *169 course of his trade or business. Respondent's argument is premised on the fact that petitioner contributed 30 cemetery lots in each of 1977, 1979 and 1981. Therefore, argues respondent, petitioner's activities were substantially equivalent to those of a dealer; hence, gain from a theoretical sale of the grave sites would have resulted in the recognition of ordinary income by petitioner. We do not agree. In our opinion, the limitation of section 170(e)(1)(A) does not apply absent a finding that petitioner actually engaged in the trade or business of selling grave sites. Petitioner is a practicing physician and has never sold grave sites. He is not transformed into a dealer merely by virtue of his donations. See Anselmo v. Commissioner,80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Petitioner is therefore entitled to a charitable contribution deduction equal to the fair market value of the 30 grave sites on November 9, 1979. In determining the fair market value of the grave sites, we must examine the market in which they are ordinarily sold to the ultimate consumer. Lio v. Commissioner,85 T.C. 56 (1985); Skripak v. Commissioner,84 T.C. 285, 322 (1985); *170 Anselmo v. Commissioner,supra;Goldman v. Commissioner,388 F.2d 476 (6th Cir. 1967), affg. 46 T.C. 136 (1966). In Lio, we said, "the sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale * * * and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved." Lio v. Commissioner,85 T.C. at 70. Petitioner argues that the grave sites should be valued on the basis of what would have been paid for them had they been purchased directly from the Cemetery. We disagree. The purchase of grave sites from the Cemetery is the primary market; the purchase of grave sites from others is the secondary market. The price of a grave site in the primary market is substantially more than that in the secondary market, as evidenced by the facts in this case. Petitioner paid $3,000 for 30 grave sites in Whitemarsh Memorial Park in 1978 and $5,000 for 30 similar grave sites in 1981. These purchases were made on the secondary market; had the same 30 grave sites been purchased, on an individual basis, directly from the Cemetery, *171 the aggregate price paid for the sites would have been in excess of $15,000. A variety of factors enter into the purchase price of cemetery lots in the primary market. In general, the Cemetery will charge whatever the market will bear. The Cemetery does not sell grave sites in bulk. Also, we are mindful that there are a number of transactions in the Philadelphia area involving bulk purchases of cemetery lots which are subsequently donated to a charitable organization. [6] We do not believe petitioner obtained the 30 grave sites for a bargain price when he purchased them from the estate in 1978, as he suggests. The executor undoubtedly was obligated to sell the lots at the highest price available. In our opinion, the most active marketplace for a theoretical sale of the donated grave sites would be the secondary market. Lio v. Commissioner,supra. Thus, the sites should be valued as if they had been sold in that market. After carefully considering the record as a whole, we conclude that the fair market value of the 30 grave sites at the time of contribution by petitioner in November, *172 1979 was $4,000. Accordingly, petitioner is entitled to a $4,000 charitable contribution deduction in 1979 with respect to his donation. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Jaffe had, in 1977, arranged for petitioner to donate grave sites which gave rise to a charitable contribution deduction not here in issue.↩
2. Neither petitioner nor his wife are members of the Church, nor has either ever visited the Church.↩
3. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in 1979. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Respondent concedes that the Church qualifies as an entity described in section 170(c).↩
5. Since this position was first raised in respondent's amended answer, respondent bears the burden of proof with respect to this issue. Rule 142(a).↩
6. See Broad v. Commissioner,T.C. Memo. 1986-340↩.