FUAD S. AND THERESA N. ASHKAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ashkar v. Commissioner
Docket No. 4775-83
United States Tax Court
T.C. Memo 1991-11; 1991 Tax Ct. Memo LEXIS 11; 61 T.C.M. (CCH) 1657; T.C.M. (RIA) 91011; January 14, 1991, Filed *11 Decision will be entered under Rule 155. Penn Benjamin Chabrow and Andrea Russin, for the petitioners. Kenneth A. Hochman, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes of $ 22,473 for 1979 and $ 25,208 for 1980. The sole issue for decision is the value of petitioners' interest in ancient Biblical fragments donated to Duke University, which in turn will determine the amount of petitioners' charitable contribution deductions. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Background
Petitioners, Fuad S. and Theresa N. Ashkar, husband and wife, resided in Miami, Florida, at the time they filed their petition. Petitioners timely filed joint Federal income tax returns for 1979 and 1980, and thereafter filed amended returns. Fuad S. Ashkar is a medical doctor practicing nuclear medicine and radiology. At all relevant times, he was an Assistant Professor of Medicine at the University of Miami School of Medicine. Petitioners *12 began collecting ancient artifacts (such as ancient coins, persian rugs, and art objects) in 1960; their collection has a value in excess of $ 1 million. Purchase of the Fragments in Beirut
During a visit to Lebanon in 1972, Dr. Ashkar became interested in purchasing two ancient Hebrew Torah [1] manuscript fragments (fragments or manuscripts) from Mr. Mohamed Taha Nassar (Taha), a Beirut antiquities dealer with whom he has had dealings since 1970. The fragments were part of a collection of 60 such fragments which Taha offered for sale. The manuscripts are written in Hebrew, on animal skin parchment. They vary in size and shape. Some are approximately two feet high and two feet wide; others are substantially smaller. Taha explained to Dr. Ashkar that the fragments dated from the 2d to 10th centuries A.D., but were in reasonably good condition. Following consultations with his father, who was a Professor of Ancient Languages at the Lebanese University and a knowledgeable collector, and other individuals in Beirut, Dr. Ashkar purchased the two fragments in March 1972 for 2,000 Lebanese pounds (approximately $ 1,000). *13 Upon his return to Miami, Dr. Ashkar showed the two fragments to Dr. Gilson, his immediate supervisor at the University of Miami. Dr. Gilson agreed with Dr. Ashkar's assessment that the manuscripts were unique and valuable. Dr. Gilson suggested to Dr. Ashkar that they acquire additional manuscripts as co-owners. Therefore, in August 1972, petitioner instructed his sister, Nayla Ashkar (Nayla) (who lived in Beirut), to purchase 20 additional manuscripts from Taha on behalf of himself and Dr. Gilson. She paid a total of 25,000 Lebanese pounds (approximately $ 10,000) for the 20 fragments. Shortly thereafter, Nayla arrived in Miami with the fragments. Drs. Ashkar and Gilson each paid her half of the fragments' total purchase price. Thus, Drs. Ashkar and Gilson jointly owned the 20 fragments. They referred to the 20 fragments and the original two fragments individually acquired by Dr. Ashkar as the "Ashkar-Gilson collection." Drs. Ashkar and Gilson understood that each had an undivided interest in all 22 fragments and that neither owned any individual fragment outright. Dr. Ashkar owned 12/22 and Dr. Gilson owned 10/22 of the collection, the unequal ownership reflecting the *14 larger investment made by Dr. Ashkar. No written agreement evidenced this understanding. In the fall of 1972, Dr. Ashkar asked Nayla to purchase the remaining 38 fragments from Taha. Taha informed Nayla that the remaining fragments had been sold to German investors in the early fall of 1972. Drs. Ashkar and Gilson have maintained their collection as a unit since its purchase. The Ashkar-Gilson collection was kept in a vault in Dr. Ashkar's home from August 1972 until 1973; thereafter, it was moved to a bank vault in Miami. The fragments were kept at the bank until 1978. A 23d fragment exists; it apparently is a detached piece from one of the two fragments which Dr. Ashkar purchased individually in March 1972. Dr. Ashkar framed this 23d fragment and kept it in a vault in his home in 1972. Ultimately, the 23d framed fragment was donated to Duke University; petitioners valued it at $ 2,300 on their 1981 return (such value was provided Dr. Ashkar by Duke University professors). The 23d fragment was eventually kept in the departmental office of the International Center of Christian Origins (International Center) at Duke University. It is not considered part of the Ashkar-Gilson *15 collection and was donated in a year not before the Court; thus, the value of the 23d fragment is not at issue. The Offers to Purchase the Ashkar-Gilson Collection
The Bikhazi Offers
Anwar Bikhazi, Professor of Physiology at the American University of Beirut Hospital, is a knowledgeable collector of antiquities, including ancient manuscripts. His collection has a value in excess of $ 1 million. In 1976, Prof. Bikhazi orally offered 750,000 Lebanese pounds (approximately $ 250,000) to Drs. Ashkar and Gilson for their collection. The offer was rejected since Drs. Ashkar and Gilson believed the value of their collection to be between $ 500,000 and $ 1 million. On November 17, 1978, Prof. Bikhazi increased his offer to 1,000,000 Lebanese pounds (approximately $ 337,500), pending authentication from Duke University. Again, Drs. Ashkar and Gilson rejected the offer. Had the offer been accepted, Prof. Bikhazi was financially capable of fulfilling his commitment. The Levison-Pataky-Israeli Offer
Mr. Milton Levison has been involved in the jewelry, pawnbroking, and antiques businesses for many years. Mr. Levison has appraised bronze figurines, paintings, and jewelry *16 for Dr. Ashkar over the years. Sometime in 1978, petitioner showed Mr. Levison infrared photographs of the Ashkar-Gilson collection and told him that he was interested in selling the collection. Mr. Julio Pataky was a customer of Mr. Levison's. Mr. Levison informed Mr. Pataky of the existence of the Ashkar-Gilson collection. Mr. Pataky viewed the fragments; thereafter, he informed Mr. Levison that he knew of three Israeli investors who might be interested in purchasing the collection. Mr. Levison never met the Israelis; he knew of their existence only through Mr. Pataky. Sometime in 1978, Messrs. Pataky and Levison, on behalf of the Israelis, offered Drs. Ashkar and Gilson $ 330,000 [2] for the collection. The offer was not accepted. The Duke University Connection
On November 29, 1977, Theresa Ashkar read an article in The Miami Herald, describing the work of Dr. James Charlesworth. Dr. Charlesworth *17 was the Director of the International Center of Christian Origins at Duke University in charge of graduate seminars on Christian Origins, the New Testament, and ancient Judaism. [3] Mrs. Ashkar contacted Dr. Charlesworth shortly thereafter and informed him about the Ashkar-Gilson collection. Following several discussions with Dr. Charlesworth, Drs. Ashkar and Gilson decided to provide him with an opportunity to study their collection. In August 1978, Dr. Charlesworth flew to Miami to examine the manuscripts. He encouraged petitioners to permit him to take the Ashkar-Gilson collection to Duke University for scholarly study. Drs. Ashkar and Gilson eventually decided to donate the fragments to Duke University. Before transporting the fragments from Miami to Duke University, Drs. Ashkar and Gilson procured an appraisal from Albert Jacobson of Miami Galleries, Inc. for purposes *18 of insuring the collection while in transit. Mr. Jacobson has been in the antiques business for 52 years. Without seeing the 22 fragments, or even pictures of the fragments, Mr. Jacobson "appraised" them at $ 1 million. Mr. Jacobson's appraisal was submitted to Gillingham Insurance Company which, through Lloyd's of London, insured the collection. Dr. Charlesworth took the collection from Miami to Duke University. At Duke University, the fragments were examined and evaluated by Dr. Charlesworth and his colleagues, Dr. Eric M. Meyers, Director of the Cooperative Program in Jewish Studies, Dr. William F. Stinespring, Professor Emeritus of Old Testament and Semitics, and Prof. Yaakov Meshorer of Hebrew University in Jerusalem, Israel. John L. Sharpe II, Curator at the William R. Perkins Library at Duke University, also examined the fragments. All 22 manuscripts were authenticated by these scholars. With the exception of fragment #18, the text that appears on the manuscripts consists of text from the books of Genesis, Exodus, Leviticus, Deuteronomy, and Numbers. The text that appears on fragment #18 is a portion of the Jewish High Holy Day (Rosh Hashana or Yom Kippur) liturgy. *19 On December 27, 1979, petitioners donated an undivided interest in 5/22 of their 12/22 interest in the Ashkar-Gilson collection to the International Center. By letter dated January 2, 1980, Dr. Charlesworth acknowledged the receipt of petitioners' interest, which he valued at $ 45,450. On November 12, 1980, petitioners donated an additional undivided interest in 5/22 of their original 12/22 interest in the Ashkar-Gilson collection to the International Center. By letter dated November 17, 1980, Dr. Charlesworth acknowledged the receipt of the additional interest, and also valued it at $ 45,450. On October 16, 1981, petitioners donated the remaining 2/22 of their 12/22 interest in the collection to the International Center. We note that Dr. Gilson donated his interest in the collection to Duke University in 1978 and 1979. Drs. Ashkar and Gilson were concerned about the tax ramifications of their donation. They asked Duke University to value the collection in order to provide substantiation for their respective charitable contribution deductions. (Petitioners withheld the Jacobson appraisal from the Duke University scholars so as not to influence their valuation.) On November *20 21, 1979, the fragments were appraised by Dr. Charlesworth, Dr. Meyers, and Prof. Meshorer at $ 100,000. Dr. Charlesworth orally informed Dr. Ashkar of the $ 100,000 valuation figure. Dr. Ashkar believed the $ 100,000 figure was too low; and by letter dated December 11, 1979, he requested Dr. Charlesworth and his colleagues to reconsider the valuation appraisal. On December 18, 1979, after further study, the scholars amended their original appraisal and determined the Ashkar-Gilson collection was worth $ 200,000. Dr. Charlesworth later acknowledged that he and Drs. Meyers and Meshorer were not competent to determine the value of the collection. Fragment #2 was scientifically dated through a technique known as AMS (Accelerator Mass Spectrometry) carbon-14 dating. This dating process involves chemically treating a portion of the manuscript in order to convert it to an accelerator target and determine its radio carbon age, plus or minus 250 years, by the amount of carbon it contains. The following results were obtained: a) On June 1, 1989, The Research Laboratory for Archaeology and the History of Art at Oxford University, England, dated fragment #2 in the range of 660-980 *21 A.D. b) On August 11, 1989, The University of Arizona, Faculty of Science in Tucson, Arizona, dated fragment #2 in the range of 600-780 A.D. Both studies professed a 95-percent level of confidence in their result. At the time of trial, the Ashkar-Gilson collection was located in the Rare Book Room of the William R. Perkins Library of Duke University. Dr. Charlesworth has the publication rights to the collection. Valuation Experts
David Noel Freedman
Petitioners' valuation expert, David Noel Freedman, an ordained minister of the Presbyterian Church, is the Arthur F. Thurnau Professor of Biblical Studies at the University of Michigan. He also holds the Endowed Chair of Hebrew Biblical Studies at the University of California, San Diego. His fields of expertise are paleography (the study of letter formation), orthography (the study of spelling), and Hebrew scriptures dating from the 2d century B.C. Prof. Freedman believes that although the fragments could be sold through an auction house such as Sotheby's or Christie's, the most likely purchaser of the fragments would be an academic institution since the manuscripts have more scholarly than artistic value. *22 Prof. Freedman opined that the value of the Ashkar-Gilson collection is between $ 300,000 and $ 700,000, or an average of $ 500,000. In his opinion, fragment #2 is the most valuable fragment in the collection since it is the most ancient of the collection; he believes fragment #2 alone is worth $ 250,000. In formulating an opinion as to the collection's scholarly value, Prof. Freedman considered: (a) the age of the fragments; (b) the form and handwriting of the text; and (c) the condition and size of each fragment. (a) The Age of the Fragments
Virtually no Torah manuscripts dating from the 1st to the 13th centuries are available for study. Fragment #2 was carbon-14 dated to between 600 A.D. to 980 A.D.; [4] fragment #2 is the oldest existing Hebrew version of Exodus Chapter 15 ("Song of the Sea"). Only three other Hebrew manuscripts which were written during the ninth century A.D. are known to exist. According to Prof. Freedman, fragment #2 provides insight into the growth and development of the writing of the Torah during this period. *23 (b) Form and Handwriting
The Masoretic text is the accepted text of the Hebrew Bible. Deviations in the ordering or spelling of words can result in revelations regarding the correct or original text of the Hebrew Bible. To accurately ascertain the original text, specimens from each era must be studied. In this regard, Prof. Freedman believes fragment #2 in invaluable and could become the prototype for dating other manuscripts from its era. (c) Condition, Size, and Language
Prof. Freedman is of the opinion that, relatively speaking, the fragments are in excellent condition and the size of each fragment is exceptionally large. Both of these factors, in his opinion, make the collection extremely valuable. Further, because the text of the Ashkar-Gilson collection is in Hebrew, he believes its worth is substantially enhanced since Hebrew or Aramaic [5] manuscripts are less common than Greek and Coptic manuscripts. *24 Menahem Mansoor
Respondent's valuation expert, Menahem Mansoor, is Professor Emeritus at the Department of Hebrew and Semitic Studies at the University of Wisconsin in Madison; he was one of the first scholars associated with the translation of the Dead Sea Scrolls. He has written prolifically on Biblical archeology. Prof. Mansoor believes the Ashkar-Gilson collection could only be sold to educational institutions. In his opinion, the collection could not be sold commercially through an auction house due to the fragments' poor condition and lack of aesthetic appeal. To this extent, he disagrees with Prof. Freedman. Prof. Mansoor opines that the scholarly value of the Ashkar-Gilson collection is between $ 25,000 and $ 30,000. In formulating his opinion, Prof. Mansoor looked at prices at which (in his opinion) comparable scholarly fragments were sold, determined the per page value of the commercially sold items, made a summary chart, and individually valued each fragment of the collection. He considered: (a) the content of the manuscripts and the variants of the text; (b) the calligraphy, paleography, and scribal practices of the fragments' text; and (c) the physical appearance, *25 preservation, and legibility of the text. (a) Contents and Variants
According to Prof. Mansoor, a Torah manuscript is valuable and significant only if it contains variants from the traditional text of the Hebrew Bible (including the Torah). Comparing the texts of each fragment of the Ashkar-Gilson collection with the traditional Masoretic Text (which was codified in 200 A.D.), Prof. Mansoor found no variants. Further, he found that the fragments did not reflect any of the Palestinian, Babylonian, or Tiberian features; therefore, he concluded that the fragments would not be of appreciable value to a scholar. Prof. Mansoor disagrees with Prof. Freedman's opinion that the order and spelling of words in fragment #2 are significant. Accepting the results of the carbon-14 dating of fragment #2, Prof. Mansoor nonetheless claims that there are hundreds of fragments dating from the 2d to 10th centuries A.D. which are currently available. With respect to fragment #18 (which is a liturgy piece), Prof. Mansoor believes that since many liturgical manuscripts are available, the variants would not be of significance to a scholar. (b) Calligraphy, Paleography, and Scribal Practices
*26 Liturgical Torah scrolls are written in Hebrew (Aramaic) square script. Prof. Mansoor believes that the Ashkar-Gilson fragments were written in such script by different hands, during different periods, an some fragments are blurred. According to Prof. Mansoor, some display beautiful skill in calligraphy but others are not remarkable in any way. Prof. Mansoor opines that there are no unique features in the Ashkar-Gilson fragments and that they possess no unusual value for research in paleography (perhaps with the exception of fragment #2, since it is the oldest). Prof. Mansoor believes the Ashkar-Gilson collection orginates from the Cairo Genizah. [6] But, according to Prof. Mansoor, currently there are approximately 200,000 fragments from the Cairo Genizah available to scholars worldwide. *27 (c) Physical Appearance, Preservations and Legibility
Prof. Mansoor submits that the preservation and legibility of the fragments affect their market value. With the exception of three or four fragments, he found the Ashkar-Gilson collection badly deteriorated, poorly preserved, and barely legible. (We note that neither Prof. Mansoor nor Prof. Freedman was aware of the Bikhazi or Levison-Pataky-Israeli offers to purchase the Ashkar-Gilson collection at the time each valued the collection.) Petitioners' 1979 and 1980 Tax Returns
Petitioners claimed a charitable contribution deduction in the amount of $ 45,450 on both their 1979 and 1980 returns with respect to their donations of a 5/22 interest in the Ashkar-Gilson collection to Duke University in said years. The amount of the deduction for each year was based on the Ashkar-Gilson collection having a value of $ 200,000 (the Duke University valuation). They filed amended returns for both years, claiming entitlement to greater charitable contribution deductions on the basis that the collection had a $ 500,000 value (Prof. Freedman's valuation). Respondent, on the other hand, determined that petitioners owned and contributed *28 individual fragments rather than fractional interests in the 22 fragments. He contends that the proper methodology for valuing petitioners' contributions is on a per fragment basis. In his notice of deficiency, respondent determined that petitioners donated 5 individual fragments to Duke University each year and that the collective value of the donated fragments (for each year) was $ 3,105. Respondent, relying on Prof. Mansoor's valuation, now contends that the collective value of all the fragments, during the years of donation, is $ 25,000. ULTIMATE FINDINGS OF FACT Petitioners donated a 5/22 interest in a collection of ancient Biblical fragments (known as the Ashkar-Gilson collection) to Duke University in both 1979 and 1980. The collection had a fair market value of $ 337,500 on the dates of donation. OPINION The issue for resolution is the value of the Ashkar-Gilson collection for purposes of determining the amount of the charitable contribution deductions to which petitioners are entitled. Generally, when a taxpayer donates property, other than money, to a qualified charitable organization, the taxpayer may deduct the fair market value of the property on the date of *29 contribution. Sec. 170A-1(c)(1), Income Tax Regs. Contributions that constitute "an individual portion of the donor's entire interest in property" qualify for the charitable contribution deduction. Sec. 170A-7(b)(1), Income Tax Regs. Here, Duke University's status as a qualified charitable organization is unquestioned. Fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. Respondent's regulations make this definition of fair market value applicable to the valuation of undivided interests in property donated to charity. Sec. 1.170A-7(c), Income Tax Regs.
The parties take diametrically opposite positions as to the fair market value of the Ashkar-Gilson collection. Valuation is an inexact science, and each case necessarily turns on its own particular facts. Messing v. Commissioner, 48 T.C. 502, 512 (1967).In most cases, each party presents one or more expert witnesses who argue a valuation formula that should be used, and testify to the misguided approach used by *30 the opposing side's expert. In Messing v. Commissioner, supra, we stated: Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations -- a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. [48 T.C. at 512; citations omitted.] In determining the fair market value of the Ashkar-Gilson collection, we must examine the market in which it would ordinarily be sold to the ultimate consumer. Goldman v. Commissioner, 388 F.2d 476 (6th Cir. 1967), affg. 46 T.C. 136 (1966); Lio v. Commissioner, 85 T.C. 56 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Skripak v. Commissioner, 84 T.C. 285, 322 (1985); Anselmo v. Commissioner, 80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). In Lio, we stated, *31 "the sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale * * * and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved." Lio v. Commissioner, 85 T.C. at 70.Thus, we first must identify the market where the Ashkar-Gilson collection would most commonly be purchased, and ascertain the price it would bring. See Anselmo v. Commissioner, 80 T.C. at 882. Dr. Ashkar testified that his original motivation for purchasing the fragments was as an investment. Dr. And Mrs. Ashkar are not in the business of buying and selling ancient Hebrew manuscripts. Dr. Ashkar was a knowledgeable collector, and if he had chosen to sell his interest in the collection, he would have sold it to another collector. Accordingly, in our opinion, the most active marketplace for a theoretical sale of the donated fragments would be the collectors' market. See Lio v. Commissioner, supra.
The values determined by the expert witnesses range from a low of $ 25,000 by Prof. Mansoor, respondent's expert, to a high of $ 700,000 by Prof. Freedman, petitioner's expert. Both Profs. Mansoor *32 and Freedman are eminently qualified in the academic fields of ancient Biblical manuscripts and both have impeccable backgrounds. Both, however, in general, presented academic rather than commercial valuations. They are scholars, not professional appraisors of ancient documents. They convinced us of the authenticity of the Ashkar-Gilson collection, but not of the financial value of the collection. Accordingly, we reject their respective values placed on the collection. See Helvering v. National Grocery Co., 304 U.S. 282, 295, 82 L. Ed. 1346, 58 S. Ct. 932 (1938). We note that Mr. Jacobson's appraisal was done solely for insurance purposes. In our opinion, he arbitrarily selected a $ 1 million figure. We wholly disregard his appraisal. There were two offers to purchase the collection -- the Levison-Pataky-Isreali offer and the Bikhazi offer. We are not convinced that Levison-Pataky-Isreali offer was bona fide. Mr. Pataky was unavailable for trial; the Israelis were nameless; and we were not persuaded by Mr. Levison's testimony. On the other hand, we believe Prof. Bikhazi's offer on November 17, 1978, of 1,000,000 Lebanese pounds (approximately $ 337,500) to purchase the Ashkar-Gilson collection was *33 bona fide. Prof. Bikhazi was a knowledgeable collector of antiquities and had the financial capability to fulfill his purchase commitment had his offer been accepted. We accept his offer of $ 337,500 as probative of the fair market value of the collection at the time of donation. (We note that the $ 337,500 figure falls within the range provided by Prof. Freedman.) Accordingly, we hold that petitioners' charitable contribution deduction with respect to their donation of interests in the Ashkar-Gilson collection to Duke University is $ 76,705 (5/22 x $ 337,500) for each year in issue, subject to the limitations provided in section 170(b) of the Internal Revenue Code of 1954 as amended. Decision will be entered under Rule 155. Footnotes
1. The "Torah" generally refers to the body of wisdom and law contained in Jewish Scripture and oral tradition. More specifically, it also refers to the Pentateuch, or the Five Books of Moses.↩
2. $ 30,000 of the $ 330,000 offer represented a commission to be paid by the buyers to Messrs. Levison and Pataky.↩
3. At the time of trial, Dr. Charlesworth was the George L. Collord Professor of New Testament and Literature at Princeton Theological Seminary.↩
4. Prior to knowing the results of the carbon-14 dating of fragment #2, Prof. Freedman (through the techniques of paleography and orthography) dated the fragment between the 2d and 9th centuries A.D.↩
5. Aramaic is a Semitic language known since the ninth century B.C. as the speech of the Aramaeans, and later used extensively in southwest Asia as a commercial and governmental language and adopted as their customary speech by various non-Aramaean peoples, including the Jews after the Babylonian exile.↩
6. In 1896, the renowned Cambridge scholar Solomon Schechter, accompanied by Professor Taylor, traveled to Cairo, where they unearthed many documents in the old synagogue of Fustat. The documents were written in Hebrew, Judaeo-Arabic, Arabic, and other Jewish dialects used by Jews living in Islamic countries of the Mediterranean. The contents encompassed every sphere of Jewish activities, including the Bible, Mishna, Talmud, Midrash, etc. The earliest date of the Cairo Genizah fragments is from the 9th century.↩