RAYMOND DEAN JENNINGS AND ROMONA FAYE JENNINGS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jennings v. Commissioner
Docket No. 41540-85
United States Tax Court
T.C. Memo 1988-521; 1988 Tax Ct. Memo LEXIS 553; 56 T.C.M. (CCH) 595; T.C.M. (RIA) 88521; November 8, 1988
Barry L. Gutterman and Douglas W. McDermott, for the petitioners. William Sabin and Kathryn E. Rooklidge, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, *556 Judge: In his notice of deficiency, respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6659
1981
$ 17,136.66
$   857
50% of the
$ 5,141
interest due on $ 17,136.66
1982
28,533.00
1,427
50% of the
6,578
interest due on $ 28,533.00
1983
42,939.00
2,147
50% of the
7,631
interest due on $ 42,939.00
After concessions and agreements by the parties, the following issues remain for decision: (1) The fair market value of art works that were donated by petitioner to several charities; (2) Whether petitioners' donations of art works are unrelated to the purpose or function of the donee charitable organization; (3) Whether part of any underpayment of tax is due to petitioners' negligence or intentional disregard of rules and regulations *557 pursuant to sections 6653(a)(1) and 6653(a)(2); and (4) Whether any portion of the deficiency was attributable to a tax motivated transaction such that interest thereon is computed pursuant to section 6621(c). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Raymond Dean Jennings and Romona Faye Jennings ("petitioners") resided in Angwin, California, when they filed their petition herein. They filed joint Federal income tax returns for all years in issue. Raymond Jennings [3] was graduated from Walla Walla College in 1958 and from Loma Linda University School of Medicine in 1962. He then completed his internship at White Memorial Medical Center and Los Angeles County Hospital. After completing his residency, petitioner took a missionary field appointment as Head of Internal Medicine and later Medical Director at Bangkok Adventist Hospital from 1967 through 1973. *558 During this period, petitioner traveled extensively throughout Thailand, Laos, Malaysia, Bali, Singapore, Cambodia and Hong Kong, collecting in excess of 200 oil paintings, hand carvings and batiks. [4] Many of the paintings were purchased in Bangkok in galleries such as the S. C. Gallery, Patburi Gallery and the Siam Intercontinental Gallery. Petitioner also received gifts of art from his patients. Petitioner did not obtain any receipts for the art he purchased; however, the chart below lists Dr. Jennings' estimates of what he paid for the paintings donated, which we accept as fact, as well as the expenses he incurred in preparing them for donation: 1981
Voice of Prophecy donations
$  1,030.00
Pacific Union College donations
3,370.00
Goodwill donations
1,000.00
Framing, Etc.
6,009.93
Total:
$ 11,409.93
1982
Pacific Union College donations
$ 1,615.00
Walla Walla College donations
2,335.00
Framing, Etc.
2,420.19
Total
$ 6,370.19
1983
American Cancer Society donations
$ 2,350.00
St. Helena Hospital donations
1,740.00
Framing, Etc.
825.00
Total
$ 4,915.00
*559 After returning to the United States in 1974, petitioners built a house in northern California. This house was designed so as to provide an 800 square foot room in the basement in which the art was stored. All but 20 to 25 paintings that were removed from their shipping cartons were displayed at petitioners' home and Dr. Jennings' medical office. Dr. Jennings began to donate portions of his art collection to various charitable organizations in 1979 and 1980. To this end, he framed certain paintings and retain John A. MacKenzie of San Francisco to appraise their values. Respondent examined petitioners' income tax returns for taxable years 1979 and 1980. Respondent's examination of the income tax returns for these two years resulted in no charges being made to those returns. On December 24, 1981, petitioners donated 11 Siamese oil paintings, 7 batiks and 3 leafboards to the Voice of Prophecy ("VOP"), a religious radio broadcasting organization affiliated with the Seventh Day Adventist Church. Petitioners had previously contributed paintings to the VOP in 1979 and 1980. The VOP informed Dr. Jennings that his 1979 and 1980 donations would be "sold at the best possible price. *560 " MacKenzie appraised the paintings donated in 1981 at $ 7,200. The VOP had a standard policy in 1981 concerning the disposition of charitable contributions it received. VOP liquidated contributions of property by using a large network of individuals to help sell the items, by mailing a publication concerning collectables to approximately 3,000 people and by advertising the contributions of property in an informational magazine which had a circulation of approximately one-quarter million. After exhausting efforts to sell the donated paintings through normal marketing channels, Lance, Liebelt, the Treasurer of VOP at that time, asked a Seventh Day Adventists Church administrator with connections to the Church's Asian ministries in California to help liquidate the paintings. This individual was apparently able to sell only two of the paintings, as he returned 19 of them to Mr. Liebelt in February, 1988. Several paintings were displayed in VOP administrative offices immediately after their donation. On December 30, 1981, petitioners donated 45 works of art to Pacific Union College. MacKenzie estimated that the fair market value for these paintings was $ 35,300. At the request *561 of Dr. Herbert Ford, then vice president in charge of fund-raising at Pacific Union, Dr. Jennings personally delivered the paintings donated in 1981 to the Art Department of Pacific Union College. Petitioners were not informed as to Pacific Union's planned use for paintings donated in either 1981 or 1982. Jon Carstens, current chairman of the Art Department at Pacific Union, has an undergraduate and masters degree in art history and currently teaches courses at Pacific Union in art history, design and composition, and stained glass. Carstens has no experience in valuing or appraising paintings. In the course of his employment, Carstens was asked to determine whether the paintings donated by Dr. Jennings would be of educational value to the Art Department at Pacific Union. At the time Carstens was asked to view the paintings, they were being stored in a closet in the Art Department. Carstens evaluated the paintings using two criteria: (1) historical criteria -- the degree to which art reflects the culture in which it was produced; and (2) the technical virtuosity displayed in the work. Carstens determined that the paintings would not be of use to Pacific Union because the college *562 did not offer courses that dealt with Pacific Rim art. [5] Furthermore, he concluded that he paintings were not designed to appeal to Oriental interests but were, instead, painted with Western tastes in mind. All the paintings donated to Pacific Union College were sold at auction. On December 28, 1981, petitioners donated five Pacific Rim paintings to Goodwill Industries. Although the paintings were not identified or appraised, Dr. Jennings represented to Goodwill that their fair market value was $ 2,534.80. [6]
On December 20, 1982, petitioners donated an additional 12 paintings to Pacific Union College. [7] MacKenzie appraised the 12 paintings for $ 19,450. *563 In December 1982, Petitioners donated 23 Pacific Rim paintings to Walla Walla College in College Place, Washington. MacKenzie appraised those paintings at $ 32,850. At the time the gift was made, petitioners stated that they were not aware as to what use the paintings would be put. Richard A. Beck, vice president for Development acknowledged petitioners' gift in a letter to Dr. Jennings, dated December 30, 1982. The letter stated the College would probably decide to convert the paintings to cash "as soon as possible." Petitioners shipped the paintings to Walla Walla on a Greyhound Bus and insured the entire shipment of donated paintings for $ 3,000. Paul Turple, vice president of Walla Walla College, is in charge of solicitation maintenance and disposition of gifts for the College. Turple attempted to dispose of the paintings or to find a use for them at the college, but was largely unsuccessful. The Walla Walla College credit union requested some of the paintings to hang in their building, but returned the paintings the same day. All the paintings that Walla Walla received in 1982 are now being stored on a storage shelf in the basement of an administrative building at *564 the College, with the exception of two paintings that were given away and three paintings that are hanging in a basement hallway. Turple did not take further steps to sell the donated paintings because their portrayal of smoking was inconsistent with the teachings of the school. Petitioners donated 17 Pacific Rim paintings to the American Cancer Society in 1983. MacKenzie appraised the paintings at $ 23,550. Dr. Jennings anticipated that the paintings would be sold by the donee. In 1983, petitioners donated 17 paintings from his Pacific Rim collection to St. Helena Hospital. MacKenzie appraised the paintings at $ 31,725. Dr. Jennings did not discuss what St. Helena would do with the donated paintings, nor did he anticipate how they would be used. St. Helena did not sell the paintings and has put them to use in their facilities. Petitioners presented evidence as to the value of the donated paintings through the testimony of three expert witnesses: John A. MacKenzie, F. Herbert Hoover and Isador M. Chait. MacKenzie has been involved in the business of appraising, selling and cataloguing works of art for approximately 30 years. He is a senior member of the American Society *565 of Appraisers and is a member of the Appraisers Association of America. MacKenzie, who is qualified to give an opinion as to the value of paintings, appraised paintings donated by petitioners each time they contemplated donating artwork to a charitable organization. MacKenzie has had prior experience appraising Oriental artwork. MacKenzie stated that he based his value estimates for petitioners' donated artwork on comparative sales at the retail level in local San Francisco galleries. On their Federal income tax returns for 1981, 1982, and 1983, petitioners claimed noncash charitable contribution deductions of $ 46,816, $ 46,757 and $ 81,460. [8] The charitable contribution deductions at issue in this case involved paintings that have been appraised by MacKenzie at $ 45,034.80, $ 52,300 and $ 55,275 for each year, respectively. The record does not allow us to determine the exact amount of charitable contribution deductions respondent disallowed that involve the donated paintings at issue here. In his statutory notice of deficiency, however, respondent disallowed all noncash charitable contributions. His determination was based on his findings that petitioners did not provide documentation *566 and substantiation of the cost of the contributions. Respondent has subsequently claimed that the fair market value of petitioners' contributions before us is limited to 7.5 percent of all appraisals that petitioners attached to their income tax returns for substantiation purposes. Petitioners retained the services of Isador M. Chait, who has been a dealer of Oriental art since 1969 and is a member of the Appraisers Association of America. Chait is qualified to give an opinion as to the value of the paintings. Chait personally inspected several of the paintings which had been donated to Walla Walla College. Petitioners also retained the assistance of F. Herbert Hoover. Hoover is an experienced appraiser of paintings, is a senior member of the American Society of Appraisers and is qualified to give an opinion as to the value of paintings. Hoover also owned a retail art gallery *567 in San Francisco for approximately 30 years. Mr. Hoover inspected paintings that Dr. Jennings donated to St. Helena Hospital. Hoover concluded that MacKenzie's appraisals were reasonable and constituted a fair valuation for the work in the year in which it was donated. Respondent's sole expert witness, Dr. Christian Title, is also a senior member of the American Society of Appraisers and is qualified to give an opinion as to the value of paintings. Title obtained a Ph.D in Art History and has been a professional art dealer for 31 years. In addition, Dr. Title has traveled throughout much of Southeast Asia. Dr. Title owns two art galleries in southern California. Title based his evaluation of the fair market value of all the paintings in question on a personal inspection of the collection of paintings that were donated to Walla Walla College. The chart below contains a comparison of appraisals by MacKenzie and Title of the 23 paintings donated to Walla Walla College. These paintings constitute a representative sample of the paintings that petitioners donated in the years in dispute: Dr. Title's
MacKenzie's
Artist
Appraisal
Appraisal
Pasan
$ 100
$    750
Apirak
125
1,250
Pasan
125
1,000
Mai
100
400
Mai
100
350
Inargon
125
2,500
Kanusyeh
90
1,800
Mai
100
1,000
Ramonsyo
90
2,000
F. M. Soejoho
(Title: Flame Tree)
90
1,800
Sonjaya
90
1,000
Pasan
100
1,000
Apirak
100
1,000
Apirak
100
1,000
Pasan
100
850
Inargon
95
1,800
Inargon
100
2,500
Sonboon
85
1,250
Suana Pewesjana (Title:
Indonesian Harvest)
100
1,500
Inargon
120
2,000
Inargon
100
1,750
Total
$ 2,135
$ 27,850
*568 ULTIMATE FINDING OF FACT The fair market value of paintings donated by petitioners for the years in dispute are as follows: 1981
$ 3,467.62
1982
4,027.10
1983
4,256.17
OPINION 1. Fair Market Value of Paintings
Section 170(a)(1) allows a deduction for any charitable contribution to or for the use of an organization described in section 170(c), payment of which is made during the taxable year. If a contribution is made in property other than money, the amount of the contribution is equal to the fair market value of the property at the time of the contribution. Sec. 1.170A-(c)(1), Income Tax Regs. Fair market value is defined by the regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; Lio v. Commissioner,85 T.C. 56, 66 (1985), affd. 813 F.2d 837 (7th Cir. 1987); See United States v. Cartwright,411 U.S. 546 (1973). Fair market value is a question of fact to be determined from an examination *569 of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985); Zmuda v. Commissioner,79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioners bear the burden of proving that the Commissioner's determination of the fair market value of the property involved is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). (a) Appropriate Market for Valuation Purposes
Section 170 and the regulations thereunder are silent as to the specific market that must be used in order to determine the fair market value of donated property. However, it has been recognized that the determination of the appropriate market for purposes of valuing charitable contributions is generally the same as that used for gift and estate tax purposes. United States v. Parker,376 F.2d 402, 408 (5th Cir. 1967); Anselmo v. Commissioner,80 T.C. 872, 881-884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Section 20.2031-1(b), Estate Tax Regs., and section 25.2512-1, Gift Tax Regs., provide that the fair market value of an item of property is determined in the market *570 where it is "most commonly sold to the public." Section 20.2031-1(b), Estate Tax Regs., provides: Thus, in the case of an item of property * * * which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the time or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) * * * is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile * * * would be purchased by a dealer in used automobiles. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * * The determination of the proper market for purposes of determining a fair market value for donations in kind is also a question of fact. Anselmo v. Commissioner, 757 F.2d at 1213; Lio v. Commissioner, supra at 66-67. Petitioners claim that galleries and art dealers, such as Cannery Row *571 in Monterey, Fisherman's Wharf and other galleries located within the tourist centers of the San Francisco Bay area, as well as art dealers on the periphery of Oriental and Asian communities, such as Chinatown, constitute the most active marketplace for artwork such as petitioners donated. Petitioners and respondent have presented expert witnesses who have testified concerning the most active marketplace for the paintings, as well as the existence of comparable sales. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); Chiu v. Commissioner,84 T.C. 722, 734 (1985). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Petitioners claim that the galleries and art dealers located within tourist centers and on the periphery of Oriental and Asian communities are the most active marketplace for the ultimate consumer, *572 such as Dr. Jennings, because these places are the most likely places in which one would purchase the type of art that Dr. Jennings did. Petitioners claim that if Dr. Jennings had lived in San Francisco instead of Southeast Asia, he would have purchased paintings by Seah Kim Joo, Lemmy or Senika Seninyka -- artists that were well-known and occasionally sold in such galleries in the San Francisco area. Petitioners' expert witnesses stated that the work of Southeast Asian artists such as these could probably be seen at the galleries that petitioners refer to as the most active market. However, petitioners have not shown that the artists that created their paintings - such as Inargon, Pasan or Apirak - were sought-after and talented as those above-mentioned Southeast Asian artists. The most effective way to establish that a particular market is the most active market for purposes of determining fair market value is to present examples of comparable sales within that market. Petitioners' expert witnesses were unable to give specific examples of comparable sales at the time of contribution. MacKenzie, who had never traveled to Thailand, testified that it was difficult to determine *573 comparable sales because the gallery owners, "nine times out of ten," had never heard of a particular Southeast Asian artist. MacKenzie also stated that in the "Pacific Rim there are hundreds and probably thousands of artists painting this type of art," making it very difficult to identify a particular artist. Chait testified that the most active market for Pacific Rim artwork was in Bangkok and Indonesia. Although Chait stated that he was not able to locate any comparable sales in the United States, he claimed that this art could be purchased in "touristy-type" locations, in galleries and in Asian communities, such as Chinatown or New York. Hoover stated that establishing the existence of comparable sales was very important in the appraisal process. He also stated that the appropriate market for the paintings was galleries in Carmel and San Francisco. Hoover could not, however, give any examples of comparable sales of paintings similar to the paintings donated by petitioners. Respondent's sole expert witness, Christian Title, stated that there were three general markets in which paintings could be bought and sold: the primary market, the secondary market and the broad market. *574 Title stated that the primary market was characterized by sales from a professional dealer or gallery to the individual buyer. The secondary market is characterized by auction sales, in which an individual collector sells some or all of his collection in an auction. The third market is the broad market, in which the work of an artist that is well-known to a broad section of the public is sold. In appraising a painting, Title said that it was necessary to determine the particular market in which the painting would be sold. Title testified that the secondary market was the appropriate market in which to appraise the paintings donated by petitioner. Dr. Jennings originally purchased the paintings on the primary market -- most of them from galleries and dealers in Thailand during his stay abroad. Because the artists who painted these paintings are virtually unknown in this country, they do not have widespread appeal and would not be found on the broad market. Therefore, in the absence of proof from petitioners that the donated paintings were by artists so well known that they should be sold on the broad market, or that Dr. Jennings is a dealer in paintings, the donated paintings *575 should be valued according to the secondary market, which is characterized by auctions. The fact that Pacific Union College liquidated its cache of donated paintings by auction merely reinforces Title's theory. We find that Title, respondent's expert witness, was very credible and that the appropriate market for the paintings is the low quality spectrum of the auction market. Conversely, petitioners' expert witnesses were unable to show any comparable sales in the market they claimed was appropriate. (b) Donee Use Bearing on Fair Market Value
Petitioners also claim that the largely unsuccessful attempts by donee charitable organizations to convert petitioners' donated paintings into cash have no bearing on a determination of their fair market value. We have, however, held that the use to which donated property is put is relevant to a determination of its fair market value. Lio v. Commissioner,85 T.C. at 71; Chiu v. Commissioner,84 T.C. at 736; Skripak v. Commissioner,84 T.C. at 322. With very few exceptions, petitioners' donated paintings have been sold or kept in storage by the donees. The paintings at Pacific Union *576 College could not be used by the art department because they were not representative of indigenous Southeast Asian culture and lacked technical merit. Pacific Union College, as we previously indicated, sold all the paintings at auction. The credit union associated with Walla Walla College refused to display the donated paintings in their buildings. Apparently, the college's efforts to sell the paintings met with failure and all the paintings are now in storage, with the exception of two paintings that were given away by the college, and three that are hanging on a basement wall. VOP was unable to sell the donated paintings through its established network of publications. Efforts to market the paintings through the administrator of the Seventh Day Adventist Church's Asian Ministries were highly unsuccessful. Although several paintings were hung in employee offices, most of the donated paintings remain in storage at the VOP. Based on the above facts, it is obvious that the paintings donated by petitioners were of little or no value to the donee organizations in their daily operations. Equally apparent is the difficulty that characterized reasonable and diligent efforts by *577 the donees to convert the donations to cash. We find the use to which the donee organizations put the paintings, as well as their diligent yet unproductive efforts to sell the paintings, highly instructive in determining fair market value. There is no evidence to suggest that the paintings donated by petitioners were in any worse shape when sold than when they were originally donated. Furthermore, there is no evidence that the donee organizations were forced to take below market prices in forced sale situations. McGuire v. Commissioner,44 T.C. 801 (1965). We conclude that petitioners have not met their burden of proof on the issue of the fair market value of the donated paintings in question, in that they have not shown comparable sales in what they claim is the appropriate market for Pacific Rim paintings. Furthermore, the donees' inability to use or even sell the paintings confirm our conclusion that petitioners' appraisals was excessive. Accordingly, we adopt the fair market values stated in our Ultimate Finding of Fact, an imprecise result, but one which reflects our assessment of the conflicting and incomplete evidence which was presented in this case. *578 In doing so, we give primary weight to the approach and opinions of expert witness Title. 2. Deduction Calculation
Section 170 generally allows a deduction of the full fair market value when charitable gifts of property are made. If, however, a gift of appreciated property is made to a charitable donee that uses the property in a manner that is unrelated to the purpose or function constituting the basis for the donee's tax exemption, the allowable tax deduction with respect to the gift is calculated by reducing the fair market value of the gift by the amount of the gain which would have been long-term capital gain if the contributed property had been sold by the taxpayer at its fair market value. [9]Sec. 170(e)(1)(B), sec. 1.170A-4(b)(3), Income Tax Regs.
Section 1.170A-4(b)(3)(i), Income Tax Regs., defines unrelated use as "a use which is unrelated to the purpose or function constituting the basis of the charitable organization's *579 exemption under section 501 * * *." This regulation goes on to provide several examples of "unrelated use": For example, if a painting contributed to an educational institution is used by that organization for educational purposes by being placed in its library for display and study by art students, the use is not an unrelated use; but if the painting is sold and the proceeds used by the organization for educational purposes the use of the property is an unrelated use. If furnishings contributed to a charitable organization are used by it in its offices and buildings in the course of carrying out its functions, the use of the property is not an unrelated use. If a set or collection of items of tangible personal property is contributed to a charitable organization or governmental unit, the use of the set or collection is not an unrelated use if the donee sells or otherwise disposes of only an insubstantial portion of the set or collection. * * * Petitioner argues that the donated paintings were used by the donees for purposes related to their exempt function and that the limitations on amounts deductible imposed by section 170(e)(1)(B) are inapplicable. A taxpayer may establish *580 that a charitable contribution is not being put to an unrelated use if he establishes (a) that the property is not in fact put to an unrelated use by the donee, or (b) that at the time the contribution is considered, made, it is reasonable to anticipate that the property will not be put to an unrelated use by the donee. Sec. 1.170A-4(b)(3)(ii), Income Tax Regs. This regulation gives an example of when such anticipation is reasonable: In the case of a contribution of tangible personal property to or for the use of a museum, if the object donated is of a general type normally retained by such museum purposes, it will be reasonable for the donor to anticipate, unless he has actual knowledge to the contrary, that the object will not be put to an unrelated use by the donee, whether or not the object is later sold or exchanged by the donee. [Sec. 1.170A-4(b)(3)(ii)(b), Income Tax Regs.] Petitioners' argument that the donees made use of the donated paintings in furtherance of their exempt purposes is without merit. It is clear from the record that petitioners are not able to establish that the paintings were not put to an unrelated use. In fact, the record establishes that, with the *581 exception of a few paintings which were hung in the administrative offices of the VOP and several paintings which were hung for an unspecified time at Walla Walla College, most of the donated paintings were not used at all. Instead, they were either stored or sold. Nor have petitioners established that it was reasonable for them to anticipate that the property would not be put to an unrelated use by the donee when the contribution was made. Sec. 1.170A-4(b)(3)(ii)(b), Income Tax Regs. Dr. Jennings donated art to the VOP in 1979 and 1980, as well as in 1981, a year which is the subject of this litigation. Dr. Jennings received letters of acknowledgment from the VOP in 1979 and 1980 concerning his gifts. Both of those letters stated that the paintings would be sold to raise money for VOP. Dr. Jennings stated that he thought the gift to the American Cancer Society would probably be sold. Furthermore, the acknowledgment letter from Walla Walla College in 1982 to Dr. Jennings stated that the paintings would most likely be converted to cash. Based on an examination of the record as a whole, we conclude that petitioners did anticipate or should have anticipated that the paintings *582 would be put to an unrelated use by the donees.[10] Although the paintings donated by petitioners were put to an unrelated use, we note that section 170(e)(1)(B) does not apply to the charitable contribution in question here because the adjusted basis of the paintings exceeded their fair market value. The explicit purpose of section 170(e)(1)(B) is to reduce tax benefits that are incident to certain contributions of appreciated property. Withers v. Commissioner,69 T.C. 900, 902 (1978). The adjusted basis of the donated paintings exceeds their fair market value. Therefore, petitioners may deduct the fair market value of the paintings, pursuant to section 1.170A-1(c)(1), Income Tax Regs. The deduction is, of course, subject to applicable percentage limitations of section 170(b). 3. Imposition *583 of Negligence Addition
Section 6653(a)(1) imposes an addition to tax if any part of an underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes an addition to tax in the amount of 50 percent of the interest on the portion of an underpayment attributable to negligence. Petitioners have the burden of proof. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioners made donations to charitable organizations in 1979 and 1980, as well as the years in dispute. The appraisals for the donated art from 1979 to 1983 were conducted by MacKenzie. Respondent audited petitioners' returns for 1979 and 1980 without adjusting the fair market value appraisal given by MacKenzie. Petitioners did not file their 1981 income tax return until respondent had completed the audit of the 1979 income tax return. We find that petitioners have met their burden of proof because their continued reliance on MacKenzie's appraisals, although mistaken, was not negligent and did not constitute disregard for the appropriate rules and regulations. 4. Interest Attributable to Tax Motivated Transaction
Section 6621(c) *584 provides for a rate of interest on deficiencies attributable to tax motivated transactions of 120 percent of the adjusted rate determined under section 6621(b). This rate applies to interest accruing after December 31, 1984, regardless of whether the tax motivated transaction occurred before that time. Solowiejczyk v. Commissioner,85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). In order to be subject to the enhanced interest rate, the deficiency must be attributable to a substantial underpayment, which is defined by section 6621(c)(2) as "any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000." Section 6621(c)(3)(A)(i) defines a tax motivated transaction as "any valuation overstatement (within the meaning of section 6659(c))." Section 6659(c) defines the term "valuation over statement:" [t]here is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount *585 determined to be the correct amount of such valuation or adjusted basis (as the case may be). Based on our ultimate finding of fact concerning the fair market value of the paintings donated by petitioners in the disputed years that are the subject of this decision, compared to the values claimed in the returns, we find that the interest rate of section 6621(c) applies by operation of law. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A)-(C) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750.↩
3. Raymond Jennings is hereinafter sometimes referred to as "petitioner" or "Dr. Jennings."↩
4. A batik is a print in which a cloth is impregnated with dye, except for portions that are covered with removable wax.↩
5. "Pacific Rim Art" refers generically to scenes, topics and art styles which are indigenous to the area of Southeast Asia.↩
6. The parties have agreed that the fair market value of these five paintings will be determined on the basis of our finding as to the overall value of the paintings donated by petitioners.↩
7. It is not clear whether 11 or 12 paintings were actually donated to Pacific Union College in 1982. The appraisal by MacKenzie and paragraph 59 of the Second Stipulation indicate that 12 paintings were donated; the acknowledgment letter from Pacific Union College, however, only lists 11 paintings. For purposes of this opinion, we find that 12 paintings were donated and subsequently taken as a charitable deduction on petitioners' 1982 income tax return.↩
8. Petitioners' return preparer stated that he calculated the noncash charitable deduction as follows: "We took the appraised value, deducted the costs and took 60 percent of the appreciation, added back the costs, and the shipping and appraisal fees, et cetra [sic], and deducted that amount."↩
9. The facts in this case will not support a finding that Dr. Jennings was in the art business, so that gain on the sale of these paintings would be ordinary income in his hands. Accordingly, sec. 170(e)(1)(A)↩ is inapplicable here.
10. Our findings that the paintings were used in a manner which was unrelated to the basis of the donee's exemption makes it unnecessary for us to address petitioners' contention that they are entitled to make an election pursuant to sec. 170(b)(1)(C)(iii)↩, because the election is not available to taxpayers who donate property that is put to an unrelated use.