JOSEPH M. ISAACS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; STEPHANIE ISAACS, a.k.a. STEPHANIE BRAND, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Isaacs v. Commissioner
Docket Nos. 31887-88, 32063-88
United States Tax Court
T.C. Memo 1991-473; 1991 Tax Ct. Memo LEXIS 522; 62 T.C.M. (CCH) 827; T.C.M. (RIA) 91473; September 25, 1991, Filed Decision will be entered under Rule 155. *522 Joseph M. Isaacs, pro se. Sanford Amdur, for the petitioner, Stephanie Isaacs, a.k.a. Stephanie Brand. Caroline Ades-Pierri, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION The primary issues in this case are the valuation of property for which petitioner claimed a charitable contribution deduction, whether petitioner Stephanie Isaacs (hereinafter referred to as Stephanie Brand) is eligible for relief from tax under section 6013(e) as an innocent spouse, and whether petitioners are liable for certain additions to tax. Section references are to the Internal Revenue Code as amended and in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure. By deficiency notices dated September 15, 1988, respondent determined the following deficiencies and additions to tax: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1983
[1]$ 1,886 --
--
--
--
1984
$ 38,304
[2]$ 1,915 $ 2,992 50 percent of
$ 9,576
interest due on
the deficiency
due to negligence
*523 Mr. Isaacs filed a petition contesting respondent's determinations for 1983 and 1984. Ms. Brand filed a petition contesting respondent's determinations for 1984 only. After concessions, the issues for decision are: (1) The fair market value of tapestries and a rare book for which petitioner claimed a charitable contribution deduction in 1983 and 1984. We hold that the fair market value of each tapestry is $ 3,000, and that the fair market value of the book is $ 550. (2) Whether Ms. Brand is an innocent spouse pursuant to section 6013(e). We hold that she is not. (3) Whether any of petitioners' underpayment of tax was attributable to negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2). We hold that it was not. (4) Whether petitioners are liable for an addition to tax pursuant to section 6661 due to a substantial understatement of income tax liability for 1984. We hold that they are not. All references to Mr. Isaacs are to petitioner Joseph M. Isaacs, and all references to Ms. Brand are to petitioner Stephanie Brand. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
When the petitions *524 were filed, Mr. Isaacs lived in New York, New York, and Ms. Brand lived in Oradell, New Jersey. Mr. Isaacs graduated from New York Law School in 1960 and is admitted to practice law in the State of New York. He is also a registered representative with the New York Stock Exchange. Mr. Isaacs marketed tax shelters from approximately 1975 to 1986. He has been an art collector for many years. Ms. Brand graduated cum laude from Fairleigh Dickinson University in 1959 with a bachelor of arts degree. Ms. Brand married Dr. Victor Brand in May 1959. They had two children, and purchased a three bedroom, split-level home in Oradell, New Jersey, in July 1967. They were divorced in September 1979. As part of the divorce settlement, Ms. Brand received the marital home and its furnishings, subject to a $ 25,000 mortgage. Ms. Brand and Mr. Isaacs were married in December 1979. He moved into Ms. Brand's home, to which he released all right and claim. During their marriage, petitioners were members of a country club which cost $ 10,000 per year. Petitioners took several trips during their marriage. They traveled to Italy in 1981, France in 1983, and France and Switzerland in 1985. They *525 often dined in fine restaurants while in Europe. Petitioners also traveled to Arizona, Colorado, and New Mexico. Mr. Isaacs bought jewelry and furs for Ms. Brand during their marriage totaling between $ 32,000 and $ 35,000. Before petitioners were married, Mr. Isaacs bought Ms. Brand a used Ford station wagon. In 1981 he bought her a new Datsun Maxima which cost $ 10,800. Mr. Isaacs gave Ms. Brand approximately $ 35,000 each of the years at issue for household expenses such as telephone, utility, cablevision and newspaper services; doctor and veterinary bills; bank payments; department and clothing store purchases; dry cleaning and hair salon services; and museum dues and other donations. Mr. Isaacs spent at least $ 20,000 for improvements to Ms. Brand's house. For example, he paid for a ceiling, track lighting, a double door, Eurostyle shades, a custom-built closet and bookshelves, paint, carpeting, a floor, and furnishings, primarily to remodel a room in the house. Petitioners were separated in December 1986. At the time of the trial for this case, their divorce proceedings had not been concluded. 2. Alexander Calder Tapestries
Alexander Calder, an American artist, *526 designed a series of tapestries in 1975 which were handwoven by Guatemalan Indians. The tapestries were made in three sizes: 4 by 6 feet, 5 by 7 feet, and 6 by 8 feet. (All size descriptions of tapestries are in feet.) Mr. Calder entered into an agreement with Catalina Meyer to sell the tapestries. Ms. Meyer sold 14 of these tapestries, all size 6 by 8, to Mr. Isaacs in July 1975 for a total of $ 12,600 ($ 900 each). The 14 tapestries are identified as follows: Floating Circles; Turquoise; Zebra; Number Nine; Sun; Moon; Star; Circus; Balloons; Swirl; Doll; Pyramid; Snake; and Lombrizi. Between 1977 and 1984, Mr. Isaacs purchased five additional tapestries and received another as a gift from Ms. Meyer. In 1978, Mr. Isaacs sold two or three tapestries for his initial cost of $ 900 each. In 1983, he donated seven 6 by 8 Calder tapestries to a charitable organization called Experiments in Art and Technology. This organization maintained the tapestries in a garage-style warehouse and did not insure or appraise the tapestries. In 1984, Mr. Isaacs donated two 6 by 8 Calder tapestries to the Yale University Art Gallery and two to the Sculpture Center, Inc., a nonprofit organization *527 devoted to sculpture, located in New York City. 3. King Lear Book
In 1984, petitioners donated a copy of King Lear, by William Shakespeare, (copy number 218/279), to the Beinecke Rare Book and Manuscript Library of Yale University. The book was published in 1963 by Ganymede Press in London and contains 16 lithographs by Oskar Kokoschka. 4. Petitioners' Tax Returns
Mr. Isaacs and Ms. Brand filed joint Federal income tax returns for 1983 and 1984. a. 1983 Return
Mr. Isaacs reported $ 239,290 as business income for 1983. Petitioners claimed a charitable contributions deduction of $ 48,051 on Schedule A of their 1983 return for seven 6 by 8 Calder tapestries and carried forward a $ 21,949 contributions deduction for 1984. Petitioners valued the tapestries at $ 10,000 each. Petitioners included with their 1983 return several documents concerning their donation such as a deed of gift to Experiments in Art and Technology and Mr. Isaacs' correspondence with this organization related to the donations. The 1983 return also includes an appraisal of $ 10,000 for each of the seven tapestries which petitioners donated in 1983. Each appraisal is dated and contains *528 the name and address of both the appraiser and Mr. Isaacs, a description of the particular tapestry, the tapestry's appraised value, and the signature of the appraiser. b. 1984 Return
Mr. Isaacs reported $ 252,647 as business and commission income for 1984. Petitioners claimed a $ 40,000 charitable contributions deduction for four 6 by 8 Calder tapestries on Schedule A of their 1984 return. Petitioners carried forward the balance of the contributions deduction, $ 21,122, to 1985. Petitioners claimed a $ 40,000 charitable contributions deduction for four 6 by 8 Calder tapestries on Schedule A of their 1984 return. Petitioners carried forward the balance of the contributions deduction, $ 21,122, to 1985. Petitioners also deducted $ 1,600 in 1984 for the charitable contribution of the King Lear book. Petitioners included with their 1984 return several documents concerning their donations of the tapestries and book, such as deeds of gift to the Sculpture Center, Inc., and to the Yale University Art Gallery. Each deed includes the name and address of the donor and donee, the date of the donation, and a description of the tapestries donated. Petitioners' 1984 return also includes *529 a receipt from the Yale University Art Gallery. The 1984 return also includes an appraisal of $ 10,000 for each of the four tapestries which petitioners donated in 1984. Each appraisal is dated and contains the name and address of both the appraiser and Mr. Isaacs, a description of the particular tapestry, the tapestry's appraised value, and the signature of the appraiser. Finally, petitioners' 1984 return contains a letter from the Yale University Library acknowledging receipt of the King Lear book. OPINION 1. Value of Tapestries
The first issue for decision is the fair market value of the tapestries for which petitioners claimed a charitable contributions deduction on their 1983 and 1984 Federal income tax returns. Ms. Brand contends that donations were not made during 1983 and 1984 and that the donee was not a charitable organization when the donations were made. Ms. Brand has not convinced us of her positions, and respondent did not raise these issues. Accordingly, we do not address them further. a. Burden of Proof
In the amendment to answer, respondent reduced the determination of the fair market value of the seven tapestries donated in 1983 from $ 5,000 *530 to $ 1,000 for each tapestry. This resulted in a deficiency for 1983 greater than respondent determined in the notice of deficiency for that year. Respondent has the burden of proof for the increase in deficiency for 1983. Rule 142(a). b. Fair Market Value
Section 170(a)(1) allows a deduction for any charitable contribution to or for the use of an organization described in section 170(c), payment of which is made during the taxable year. In general, the amount of a charitable contribution made in property other than money is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; United States v. Cartwright, 411 U.S. 546, 550-551, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973); Johnson v. Commissioner, 85 T.C. 469 (1985). Fair market value is a question of fact to be determined from an examination of the entire record. Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth *531 v. Commissioner, 813 F.2d 837 (7th Cir. 1987). Fair market value is a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo 1961-347. Valuation is an approximation derived from all the evidence. Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 66-67, 86 L. Ed. 1266, 62 S. Ct. 925 (1942); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo 1974-285. c. Expert Testimony
Respondent and Mr. Isaacs each called expert witnesses to give their opinions about the value of the eleven Calder tapestries which petitioners donated in 1983 and 1984. Expert witnesses' opinions can aid the Court in understanding an area requiring specialized training, knowledge, or judgment. Estate of Winkler v. Commissioner, T.C. Memo 1989-231. However, as the trier of fact, the Court is not bound by the experts' opinions. Helvering v. National Grocery Co., 304 U.S. 282, 295, 82 L. Ed. 1346, 58 S. Ct. 932 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). The opinions of expert witnesses are weighed according to the experts' qualifications and *532 other relevant evidence. Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. T.C. Memo 1956-178; Johnson v. Commissioner, supra at 477; Chiu v. Commissioner, supra at 734. Everett Burger, Mr. Isaacs' witness, and Kenneth Jay Linsner, respondent's witness, both have well-established expertise as appraisers in the field of the arts, including the objects at issue here. Everett Burger has appraised art for approximately 40 years. He has been a member of the Appraisers Association of America for 35 years and has served as a member of its board of trustees and chairman of its Membership Committee. Mr. Burger was at one time in business in New York selling antiques. He is familiar with a wide array of art and fine art. He valued the Calder tapestries by visiting galleries that handled and sold them and by obtaining from gallery personnel sales prices for these tapestries. Kenneth Jay Linsner has had 20 years of experience in the museum, auction, and appraisal fields. He is a member of the American Society of Appraisers, the Appraisers Association, the International Society of Appraisers, and the New England Appraisers Association, and he is a *533 Senior Certified Valuer of the International Institute of Valuers, Zurich. Mr. Linsner has made between 5,000 and 6,000 appraisals since 1968. Since 1983, he has evaluated between 280 and 300 Calder tapestries for the IRS. Mr. Linsner obtained information about sales of Calder tapestries from a catalog library which he maintains, and from regular visits to galleries and auction houses. He used the theories of most common market and contemporary sales or auction data to value the tapestries. Mr. Linsner testified that all of the Calder tapestries that he examined for the IRS had also been appraised by Mr. Burger. He accused Mr. Burger of starting a tax shelter at the Galleria Bonino by being designated by Ms. Meyer and her agents as the sole appraiser of contributions of the Calder tapestries. Mr. Burger disputed this accusation, but indicated he had appraised paintings for the estate of Alfred Bonino or Ferdinand Bonino. Mr. Burger and Mr. Linsner reached widely different conclusions concerning the fair market value of Calder tapestries in 1983 and 1984. Both based their opinion of fair market value at least in part on comparable sales. Generally, comparable sales of similar *534 properties that are reasonably proximate in time represent the best evidence of fair market value. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24, 1233 (1987). In some cases, sales that occurred during years other than those in issue are helpful in determining fair market value because they can either show a trend or indicate the fair market value for the years in issue. Estate of Spruill v. Commissioner, supra at 1233; Estate of Gilford v. Commissioner, 88 T.C. 38, 52-55 (1987). Subsequent events or facts may be used to corroborate an appraisal that is based on facts known as of the valuation date. See Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. T.C. Memo 1982-440. We also consider sales of comparable property occurring after the valuation date if there are no uncertain probabilities or contingencies which affect the value of the property. Estate of Thompson v. Commissioner, 89 T.C. 619, 628-629 n.7 (1987), revd. on other grounds, 864 F.2d 1128 (4th Cir. 1989); Estate of Stanton v. Commissioner, T.C. Memo 1989-341; Estate of Moss v. Commissioner, T.C. Memo 1982-85. In his report, Mr. Burger considered *535 the following sales of Calder tapestries: In 1976 (8 or 9 years before the years of the donations), Galleria Bonino, Rosenhouse, and Circle Gallery each sold 6 by 8 tapestries for $ 5,000. Mr. Burger does not indicate the number of tapestries that were sold at each of these locations. In 1984, a 5 by 7 tapestry was sold at auction at Christie's New York for $ 8,500 plus a 10 percent buyer's premium. In 1986, a 5 by 7 tapestry was sold at William Doyle for $ 10,000 plus a $ 1,000 premium. A 6 by 8 tapestry was sold at CAC Publications for $ 10,000. Mr. Burger does not give the year of this sale. Mr. Burger appraised the Calder tapestries at $ 10,000 each in 1983 and 1984. Mr. Burger's report is two pages long and does not contain a discussion of his methodology. Mr. Burger provided information about only six sales of Calder tapestries which he used to estimate the fair market value of the tapestries. Mr. Linsner, respondent's expert, believes that the 1984 sale at Christie's New York and the 1986 sale at William Doyle Galleries were "cooked." The object of a cooked sale is to inflate the perceived value of the item sold. In response, Mr. Burger argues that the sales occurred *536 at legitimate galleries that would not engage in "cooked" sales. Mr. Burger and Mr. Lisner disputed the weight to be given to sales at Christie's New York and Sotheby's versus Christie's East or Sotheby's Arcade in light of the fact that lower-priced items are generally sold at the latter locations. Mr. Linsner, respondent's expert, valued the tapestries at $ 1,250 each. He used the theories of most common market and contemporary sales or auction data to value the tapestries. Mr. Linsner asserts that, by selling tapestries in bulk to nondealers at deeply discounted prices, Ms. Meyer shifted the most common market from retail sales to sales at prices below wholesale "through aggressive merchandising and control of wholesale, discount and even retail prices." He attached two documents to his report, purporting to show that Ms. Meyer sold 6 by 8 Calder tapestries for $ 1,250 each to certain individuals, while she offered the same size tapestries on the retail market for $ 10,000 each. While such sales may have occurred, the evidence in the record is not sufficient to convince us that they did, or that Mr. Linsner's theory is correct to the exclusion of consideration of other sales. *537 In his report, Mr. Linsner considered the following sales: In 1978, a Calder tapestry sold for $ 750. In 1985, two tapestries sold at Christie's East for $ 550 and $ 700 each. In 1987 two tapestries sold at Sotheby's Arcade, one for $ 750 and the other for $ 5,000. In 1988 three tapestries sold at Christie's East, two for $ 1,700 each and one for $ 2,800. In 1989 seven tapestries sold at Christie's East, two for $ 2,400 each, two for $ 2,800 each, and three sold for $ 3,200, $ 3,500, and $ 6,000. Mr. Linsner did not indicate the size of any of these tapestries. Attached to Mr. Linsner's expert report are documents which describe other possible sales of Calder tapestries. Mr. Linsner based his appraisal of the Calder tapestries on a larger number of comparable sales than did Mr. Burger. In addition, Mr. Linsner explained in his report the theories on which he based his appraisal and why he relied on these theories. Mr. Linsner's report, however, has flaws. First, the size of a tapestry influences its selling price, but Mr. Linsner does not indicate the size of any of the tapestries on which he based his assessment. Mr. Linsner testified that he primarily considered 6 by *538 8's, but also looked at 5 by 7's. Second, Mr. Linsner's report contains several minor errors. For example, Mr. Linsner said that the Supreme Court of New York, in a case brought by Alexander Calder's Estate, rendered a decision against Ms. Meyer when, actually, that case was disposed of by settlement. His report included mistakes duplicated from a report he wrote for an earlier tax year in an unrelated case. Overall, however, we find Mr. Linsner's report more substantial and credible than Mr. Burger's report. Ms. Brand asserts that, because Experiments in Art and Technology maintained the donated tapestries in a garage-style warehouse and did not insure or appraise them, the tapestries had no value whatsoever to that organization. While a donee's use of donated property is relevant in determining the property's fair market value, Lio v. Commissioner, 85 T.C. at 71, Chiu v. Commissioner, supra at 736, there is ample evidence in the record to suggest that the tapestries had substantial value. Taking into account the entire record, we conclude that the fair market value of the tapestries donated by petitioners in 1983 and 1984 is $ 3,000 each. 2. Value of the *539 Rare Book
The next issue for decision is the fair market value of the rare book for which petitioners claimed a charitable contribution deduction for 1984. In 1984, petitioners deducted $ 1,600 for a charitable contribution of a 1963 edition of King Lear by William Shakespeare to the Beinecke Rare Book and Manuscript Library of Yale University. Respondent disallowed this deduction in full. At trial, Mr. Isaacs said that he paid $ 1,600 for the book in 1976. Mr. Isaacs did not introduce into evidence corroboration of the purchase price or an appraisal of the book at the time of donation, nor expert testimony about the book's value. The only valuation testimony for the book was elicited from Mr. Linsner by Mr. Isaacs. Mr. Linsner said that he appraised the book in late 1986 and he has records of seven comparable sales from 1982 to 1986. The first four sales occurred at Sotheby's London in December 1982 and January, May, and November 1983. The dollar equivalents of the sales prices are $ 442, $ 516, $ 668, and $ 400, respectively. The next sale occurred in October 1984 at Christie's Kensington for $ 275. In May 1987 a rebound copy of the book was sold in Hamburg for $ 1,020. *540 Finally, in May 1987 a copy of the book that had been rebound in "goatskin extra" by Robinson, one of the contemporary masters of binding, sold for $ 2,820. Respondent's objections to this testimony were overruled. Mr. Linsner testified that $ 500 to $ 600 was a generally acceptable auction value for the book from mid to late 1983 into 1984. We find that the fair market value for the King Lear book at the time of donation in 1984 was $ 550. 3. Innocent Spouse
The next issue for decision is whether Ms. Brand is an innocent spouse pursuant to section 6013(e). A husband and wife who file a joint return are jointly and severally liable for tax. Sec. 6013(d)(3). However, section 6013(e) sets out four requirements which, if met, treat a spouse as an innocent spouse, thereby relieving the spouse from joint and several liability. All four requirements must be met to qualify as an innocent spouse. Estate of Jackson v. Commissioner, 72 T.C. 356, 362 (1979). We will discuss each requirement separately. a. Joint Returns
The taxpayer asserting innocent spouse status must prove that joint returns were made for each year in issue. Sec. 6013(e)(1). Mr. Isaacs and Ms. *541 Brand filed joint Federal income tax returns for both 1983 and 1984. b. Grossly Erroneous
The taxpayer asserting innocent spouse status must prove that there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return. Sec. 6013(e)(2). A grossly erroneous item is any item omitted from gross income attributable to such spouse and "any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law." Sec. 6013(e)(2)(A) and (B). A deduction has no basis in fact when the expense for which it is claimed was never, in fact, made and has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986), affd. without published opinion (10th Cir. 1989). A deduction is grossly erroneous under section 6013(e)(2)(B) only if it has "no basis in fact or law." Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987). Grossly erroneous deductions are fraudulent, frivolous, or groundless. *542 Purcell v. Commissioner, supra at 475. Petitioners overvalued the Calder tapestries and the rare book which they deducted in 1983 and 1984. However, petitioners' deductions were not grossly erroneous. Although this conclusion alone precludes Ms. Brand from qualifying as an innocent spouse under section 6013(e), we discuss the remaining requirements. c. Knowledge
The taxpayer asserting innocent spouse status must prove that he or she did not know, and had no reason to know, of such substantial understatement when signing the return. Sec. 6013(e)(3). We consider whether Ms. Brand knew or had reason to know that the claimed deductions had no basis in law or fact. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo 1988-63. Ms. Brand denied knowing about the tapestry donations which took place in 1983 and 1984. She testified that she did not know how much Mr. Isaacs earned each year or how much he was worth. She also testified that, after a period, petitioner stopped receiving business records and mail at the marital home. Ms. Brand knew, however, that petitioner owned the Calder tapestries and that he obtained them from Ms. Meyer. *543 At trial, she explained that petitioner moved some of the tapestries into her home when petitioners were married and that these tapestries were stored in a basement closet. Ms. Brand testified that she was aware of one time during petitioners' marriage when petitioner tried to sell a Calder to friends of theirs and that she thinks that he sold one to another friend in 1986. Ms. Brand knew about the donation of a tapestry to the University of Arizona in 1982, and about a possible donation to Yale University, although she did not indicate whether the item donated to Yale University was a tapestry. Mr. Isaacs testified that Ms. Brand knew the tapestry donations were made in 1983 and 1984. Mr. Isaacs also testified that Ms. Brand looked at and inspected each income tax return that she signed, and the 1984 return contained information about the book donation. Ms. Brand has not convinced us that she did not know about the tapestry and book donations that were made in 1983 and 1984. Accordingly, we find that Ms. Brand failed to satisfy her burden of proof as to section 6013(e)(3). d. Equity
Finally, the taxpayer asserting innocent spouse status must prove that, taking into *544 account all the facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency. Sec. 6013(e)(4). In deciding whether it is inequitable to hold a spouse liable for a deficiency, we take into account whether the purported innocent spouse significantly benefited, either directly or indirectly, from the items omitted from gross income. Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs.; H. Rept. 98-432 (Part 2) 1501, 1502 (1984). Normal support is not a "significant benefit" for purposes of determining whether it is inequitable to hold petitioner liable for the deficiency. Flynn v. Commissioner, 93 T.C. 355, 367 (1989); Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979); Hayes v. Commissioner, T.C. Memo 1989-327; sec. 1.6013-5(b), Income Tax Regs. Normal support is to be determined by the circumstances of the parties. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Flynn v. Commissioner, supra at 367; Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989). "Unusual support *545 * * * would, however, constitute 'benefit' and should be taken into consideration." S. Rept. 91-1537 (1970), 1971-1 C.B. 606, 607-608; Estate of Krock v. Commissioner, supra at 679. Ms. Brand admitted, in her Certification in support of pendente lite relief in connection with her divorce proceeding, that during petitioners' marriage petitioners "lived a very elegant lifestyle * * * with all the money * * * [Joseph] had at his fingertips." Petitioners were members of a country club which cost $ 10,000 per year. The parties disagreed about whether it was better than one to which Ms. Brand belonged before petitioners' marriage. They also disagreed about which one of them played golf before the marriage and whose idea it was to join the country club. However, they both utilized the club. Petitioners traveled to Italy in 1981, France in 1983, and France and Switzerland in 1985. While in Europe, they often dined in fine restaurants. Petitioners also traveled to Arizona, Colorado, and New Mexico. While the parties disagreed about how expensive these trips were and about which one of them enjoyed eating at expensive restaurants, we conclude that they both enjoyed these things. *546 Ms. Brand testified at trial that petitioners usually ate at restaurants only one night per week during their marriage. This statement contradicts the statement in her Certification in support of pendente lite relief that, "we usually ate out in restaurants on Friday, Saturday and Sunday nights - and during the summer we ate out three nights a week at the Edgewood Country Club where we were members." Ms. Brand testified that, when she signed the Certification, she believed the statements to be true but that she later realized that, because she was emotionally upset and did not understand the questions, she had made errors. She also said that she relied on her attorneys to draft the documents and assumed that what they told her was correct. Her explanation is murky at best, and detracts from her credibility. Mr. Isaacs bought Ms. Brand a used Ford station wagon before they were married and a new Datsun Maxima after they were married. He gave her substantial amounts for household expenses, jewelry and furs, and improvements to her house. Although Ms. Brand said that Mr. Isaacs made some of these latter expenditures to accommodate his son when he visited and so that Mr. Isaacs *547 would have a place for his books and a piece of stained glass, these were renovations to her home and she benefited from them. Ms. Brand purports to calculate the amount of petitioners' disposable income and concludes that none of petitioners' tax savings inured to her benefit. She argues that Mr. Isaacs' income "was more than enough to pay for his own lifestyle and [her] normal lifestyle." This accounting does not convince us that Ms. Brand did not benefit from petitioners' tax savings. Ms. Brand benefited from the fact that Mr. Isaacs paid less in taxes in 1983 and 1984 because of the charitable contributions deductions and, so, had more money to spend on their lifestyle. Ms. Brand argues that, during 1984, she was unable to travel because she was being treated for torn ligaments in her arm, and that she only played golf briefly that year due to the condition. However, she nonetheless benefited in other ways from Mr. Isaacs' increased income during 1984. For the foregoing reasons, we are not persuaded that it would be inequitable to hold Ms. Brand liable for the deficiency. Accordingly, we hold that Ms. Brand is not entitled to innocent spouse relief. 4. Negligence
*548 The next issue for decision is whether any of petitioners' underpayment of tax for taxable year 1984 was attributable to negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2). Section 6653(a) provides for an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1) imposes an addition to tax equal to five percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 66543(a)(2) imposes an additional liability of 50 percent of the interest payable on the deficiency with respect to the portion of the underpayment which is attributable to negligence or intentional disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo 1964-299; Neely v. *549 Commissioner, 85 T.C. 934, 947 (1985). While a showing of honesty, good faith, and disclosure by the taxpayer may preclude the existence of fraud, good faith does not always negate negligence. Wesley Heat Treating Co. v. Commissioner, 30 T.C. 10, 26 (1958), affd. 267 F.2d 853 (7th Cir. 1959). Rather, the taxpayer must show that he acted reasonably and prudently and exercised due care. Neely v. Commissioner, supra.
Good faith reliance on the advice of a competent, independent expert or tax professional, possessed of all the information, may offer relief from the imposition of the negligence addition. See Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. T.C. Memo 1968-98. Petitioners, however, bear the burden of proving that they exercised due care and were reasonable in their reliance. Rule 142(a). Respondent asserts that Mr. Isaacs did not act reasonably, prudently, or with due care. Respondent says that the facts of the case infer that there was a connection between Ms. Meyer, Mr. Burger, Experiments in Art & Technology, and Mr. Isaacs with regard to the Calder tapestries. It is respondent's position that Mr. Burger's appraisals were *550 not independent appraisals, and that Mr. Isaacs must have known of this lack of independence because of his close relationship to Ms. Meyer. Additionally, respondent asserts that, since the appraisals attached to the 1984 return did not give the credentials of the appraiser, Mr. Isaacs acted negligently in relying on the appraisal. We are not convinced that Mr. Burger was not acting independently in appraising the tapestries. While Mr. Burger did not include his credentials in the appraisals, we do not find that this made it unreasonable for Mr. Isaacs to rely on him. Respondent also asserts that, since the appraisals attached to the 1984 return gave no analysis of how the value was derived, Mr. Isaacs acted negligently in relying on them. However, considering Mr. Burger's qualifications as an appraiser, this also did not make it unreasonable for Mr. Isaacs to rely on the appraisals. Accordingly, we find that petitioners' underpayment of tax with respect to the tapestries was not attributable to negligence or intentional disregard of rules or regulations. Respondent asserts, finally, that petitioners have failed to establish that they were not negligent with regard to the charitable *551 deduction for the King Lear book. Petitioners deducted $ 1,600 for the book on their 1984 tax return. Mr. Isaacs stated at trial that this is the amount he paid for the book in 1976. We find his statement to be credible and, given this, find that he was not negligent in thinking that the book would have maintained its value from 1976 to 1984, the year petitioners donated it. Thus, petitioners' underpayment of tax with respect to the book was not attributable to negligence of intentional disregard of rules or regulations. Accordingly, petitioners are not liable for additions to tax under section 6653(a)(1) and (2). 5. Substantial Understatement of Income Tax
The next issue for decision is whether petitioners' underpayment of tax for taxable year 1984 was a substantial understatement of their income tax pursuant to section 6661. Section 6661(a) imposes an addition to tax of 25 percent, Pallottini v. Commissioner, 90 T.C. 498, 503 (1988), when there is a substantial understatement of income tax in any given taxable year. A substantial understatement exists if in any year the amount of the understatement exceeds the greater of $ 5,000 or 10 percent of the amount required *552 to be shown on the return. Sec. 6661(b)(1). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2); Tweeddale v. Commissioner, 92 T.C. 501 (1989); Woods v. Commissioner, 91 T.C. 88, 95 (1988). There are two ways in which a taxpayer may reduce or eliminate the amount of a substantial understatement. First, if the taxpayer has substantial authority for his tax treatment of any item on the return, the understatement is reduced by the amount attributable thereto. Sec. 6661(b)(2)(B)(i). Substantial authority refers to legal precedents which support the taxpayer's application of the law to the particular facts at issue. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6661-3(b)(2), Income Tax Regs. Because the legal authority for petitioners' charitable contributions deductions is not the issue in dispute, this is not applicable here. Second, if the taxpayer adequately disclosed relevant facts with respect to an item's tax treatment in the return or in a statement attached to the return, *553 the understatement is reduced by the amount attributable thereto. Sec. 6661(b)(2)(B)(ii). Respondent asserts that petitioners have not adequately disclosed relevant facts in the return or in a statement attached to the return with respect to the tax treatment of the donated property sufficient to reduce their tax liability under section 6661(b)(2)(B)(ii). Section 6661 does not set forth what constitutes adequate disclosure of relevant facts. Treasury's regulations provide for disclosure of information about the tax treatment of an item either in Form 8275 or in a statement attached to the return or on the return itself. Sec. 1.6661-4(b) and (c), Income Tax Regs. As to disclosure on the return, respondent may by revenue procedure prescribe the circumstances in which information provided on the return will be adequate disclosure for section 6661. Sec. 1.6661-4(c), Income Tax Regs.
However, even where a taxpayer fails to comply with the method set forth by the regulations, disclosure is nonetheless adequate if the taxpayer provides sufficient information on the return to enable the IRS to identify potential controversy. Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987); *554 Pinson v. Commissioner, T.C. Memo 1990-234. Petitioners included substantial documentation with regard to the tapestry and book donations on their 1984 tax return, including a schedule of the deductions, deeds of gift, and appraisals. We find that this was sufficient to enable the IRS to identify the controversy. Accordingly, petitioners are not liable for the substantial understatement addition of section 6661 for taxable year 1984. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent's amendment to answer increased the deficiency determined for 1983 to $ 14,154.50, based on a reduced estimate of the value of the Calder tapestries to $ 1,000 each. ↩
2. Respondent concedes that petitioners' Federal income tax return for 1984 was timely filed, and petitioners are not liable for the delinquency addition.↩